David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, Nevada 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Allison R. Schmidt, Esq.
Nevada Bar No. 10743
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117
Phone: (702) 387-7222
Fax: (702) 387-7222
Email: Allison@nevadaslawyers.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

RICHARD B. HOGUE,

              Plaintiff,

      vs.

ALLIED COLLECTION SERVICE, INC;
SELENE FINANCE, LLC; MOUNTAIN
AMERICA CREDIT UNION; SILVER
STATE SCHOOLS CREDIT UNION; IBEW
PLUS CREDIT UNION; EQUIFAX
INFORMATION SERVICES, LLC;
EXPERIAN INFORMATION SOLUTIONS,
INC,

             Defendants.

CASE NO. **2:16-cv-01620-JCM-VCF**

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Richard Hogue moves for partial summary judgment on the issue of Defendant Silver State Schools Credit Union ("Silver State") liability for failing to conduct a reasonable investigation into Plaintiff's consumer disputes and subsequently reporting inaccurate information on Plaintiff's credit reports, as well as failing to send its report of investigation to other credit reporting agencies.  In both respects, Silver State violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").  Plaintiff believes calculation of his damages is best decided by a jury of his peers, and thus seeks judgment as a matter of law only as to liability.

## **INTRODUCTION**

This case has to do with a loan Richard co-signed to help his cousin's daughter's boyfriend buy a car.  Unfortunately for Richard (and perhaps his cousin), the boyfriend absconded, leaving Richard stuck with a car he didn't want, and a bill he now couldn't afford.  When Richard filed for Chapter 13 bankruptcy, he included the jointly held auto loan in his bankruptcy schedules.  Silver State wanted to collect, however, so they pried the debt out of the bankruptcy and then sought to repossess the car.  Richard complied with Silver State's wishes, permitted Silver State to repossess the car in the Spring of 2010, and believed that his hard-luck relationship with Silver State had come to a close.

After Richard earned his Chapter 13 bankruptcy discharge in 2014, he ordered a copy of his Experian credit report.  To his surprise, he discovered that Silver State believed he existed in three separate, mutually exclusive credit-related dimensions.  First, Silver State reported that the collateral had been *voluntarily surrendered* in 2010.  Then, it reported the account had been *discharged* in bankruptcy in 2014.  Finally, Silver State reported that he still owed over $14,000 on the loan but hadn't made a payment in years, nor had been asked to do so – while at the same time claiming that there was a $0 balance on the account.

This three-dimensional paradox makes no sense under either prevailing industry reporting guidelines, nor to anyone who may have looked at Richard's credit report.  It leads to the fundamental question: were Richard's obligations on the loan, as reported, actually included or discharged in Chapter 13 bankruptcy, or weren't they?  It's impossible to say for sure based on Silver State's reporting, and the information Silver State reported is materially misleading by failing to make Richard's debtor-creditor relationship clear.  Instead, Silver State reported the

worst possible scenario: that that Richard surrendered the collateral, but also that the debt was "included" in his bankruptcy not on his petition date, but on his discharge date. Moreover, it wants to report that *despite* these two events – each of which would terminate Richard's account relationship with Silver State either as a matter of law or a matter of fact – Richard *still* owed a post-discharge balance of more than $14,000 on the loan.

One thing is clear, however: Richard's account was unequivocally reporting as "negative," and all three of these reported items of information pointed in that direction. 15 U.S.C. § 1681c and prevailing industry guidelines permit a tradeline to report "negatively" for up to 7 years following the date it was included in bankruptcy, and nothing on Experian's reinvestigation indicates that this seven-year period would not run from the date these debts were "included" in Chapter 13 bankruptcy. Silver State's paradoxical reporting had the consequence of "re-aging" Richard's debt, and causing it to report negatively longer than legally permissible under either the FCRA, and violated Silver State's obligation under 15 U.S.C. § 1681s-2(b) to report his account information accurately. This violation of the FCRA's "aging" statutes under Section 1681c has had real consequences on Richard's ability to put his name on his family's home mortgage, and is also a salient issue for his continued employment with the federal government, which requires a security clearance.

Richard disputed his Silver State information with Experian as required under 15 U.S.C. §§ 1681i and 1681s-2(b), but Silver State kept reporting negatively. As it turned out, this strange reporting resulted from Silver State's erroneous Automated Credit Dispute Verification ("ACDV") to Experian in response to Richard's dispute, in which Silver State reported the account as included in Chapter 13 bankruptcy, but also reported a status of "L," which means "charge-off." In so doing, Silver State violated industry standards regarding the reporting of accounts included in bankruptcy, for which it was supposed to report the account as having a zero balance and was current. And after Richard sued Silver State for its failure to correct his reporting, Silver State sought to punish Richard by contacting Experian, and *insisting* that the certain derogatory information should continue to be reported.[1]

---

[1] Richard's case also involves a likely impermissible credit pull from Silver State. While not part of his allegations here, it's the subject of another class action in this District. *See Travers v. Experian Information Solutions, Inc.*, No. 17-cv-1591-JCM-CWH (D. Nev.).

Furthermore, Silver State also clearly failed to transmit the results of its investigation to other data furnishers to whom it reported under 15 U.S.C. 1681s-2(b)(1)(D), because although Silver State modified Richard's account and sent *Experian* an ACDV, Richard's January 2017 Trans Union credit report continued to report the account as "closed" in March of 2010, without indicating that the account had been included in bankruptcy (and thus might have "aged off" of his account).

As Richard found out as the case moved forward, it's actually not surprising that Silver State reported such patently contradictory information – because Silver State's own record-keeping is in shambles. Most astonishingly, Silver State confessed that it hadn't even retained a copy of the industry-standard guidelines which purportedly governed how it would report his account. Nor did Silver State have a copy of any contract with e-Oscar, the entity which would have sent its investigation to the other CRAs (and around which it built its own internal reporting guidelines). Moreover, the only shred of evidence Silver State produced any regarding its relationship with Experian was a three-page, sixteen-year-old "subscriber agreement" which was not signed by Experian, never mentioned e-Oscar, and suggested that Experian would "own" the data Silver State provided to it. Thus, Silver State has produced no evidence that Experian ever agreed to accept data from it, or the terms and conditions related to the same. In fact, Silver State failed to keep many of the records of Richard's dispute which its "policies" required that it keep, and its own internal loan records indicate that the account balance reported to Experian and the actual account balance are different. This lackadaisical record-keeping demonstrates that Silver State was reckless in attempting to comply with its FCRA obligations, which equates to willfulness under the FCRA.

Finally, and while not specifically part of Richard's motion for partial summary judgment, he's also entitled to recover statutory damages for Silver State's willful violation of the FCRA, as well as actual damages for any negligent failure of Silver State.[2] In both instances, he's also entitled to recover attorney's fees.[3]

In sum, there's no disputed issue of material fact that Silver State violated the FCRA's reporting provisions at 15 U.S.C. 1681s-2(b), and the Court should enter partial summary

---

[2] 15 U.S.C. §§ 1681n, 1681o.
[3] *Id.*

1    judgment in his favor.  Richard's damages are more properly a question of fact for the jury, and

2    he wishes to present his damages from Silver State's violations to his peers at a later date.

3

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

4    **A.  Richard helps his daughter's boyfriend purchase a car by co-signing for a loan.**

5         1.       On August 8, 2009, Richard co-signed a loan from Silver State Schools Credit

6    Union with Daniel Harper, in order to finance the purchase of a used 2004 Suzuki Verona.[4]  Mr.

7    Harper was Richard's cousin's daughter's boyfriend, who had been riding the bus for about a

8    year.[5]  Richard's informal agreement would be that it would be Daniel's car,[6] and Daniel in fact

9    acquired possession of it after the purchase.[7]  Consequently, it was agreed between Richard and

10    Daniel that Daniel would make the payments on the car.[8]  Other than the test-drive, Richard

11    never drove the car,[9] and he never even had a set of keys for it.[10]

12    **B.  Richard files for Chapter 13 Bankruptcy, including the Car in his voluntary petition and providing for it in his Chapter 13 plan or reorganization.**

13

14         2.       On January 31, 2009, Richard filed for Chapter 13 bankruptcy, after an injury left

15    him unable to work and he was subsequently laid off from his job.[11]  Richard included the

16    Suzuki on Schedule D of his Petition, stating the he intended to surrender his interest in the

   vehicle.[12]  Richard's understanding was that if Daniel wished to keep the car, he could continue

17    making the payments.[13]  Daniel did make some of the payments after Richard filed bankruptcy,[14]

18

19    ——————————————

20 [4] Excerpts from Feb. 10, 2017 Deposition of Richard Hogue ("Hogue Depo"), **Exhibit 22**, at 48:23-50:15; 52:3-16; August 9, 2008 Credit Application for Suzuki Verona and Kelly Blue Book Estimate, SSSCU000004-7 ("Application"), **Exhibit 1**; Silver State Workflow History from 1/1/2000 to 2/1/2017, SSSCU000116-119 ("Workflow History"), **Exhibit 2**.

21 [5] Hogue Depo, 16:22-17:9; 45:8-23.

22 [6] *Id.* at 54:4-14.
[7] *Id.* at 55:18-56:2.
[8] *See id.* at 56:17-21; 66:17-20.

23 [9] *Id.* at 56:4-21.
[10] *Id.* at 101:15:17.

24 [11] *Id.* at 57:16-24; Voluntary Petition for Chapter 13 Bankruptcy, Case No. 09-11367-btb, ECF Dkt. 1 (Bankr. D. Nev. Jan. 1, 2009) ("Petition"), **Exhibit 3**. Plaintiff requests this Court take judicial notice of any cited documents made in

25 court filings as matters of public record, pursuant to Fed. R. Civ. P. 201(b).  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.11 (9th Cir. 2006) (citing *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d

26 1360, 1364 (9th Cir. 1998)).

[12] Petition, at 17.  John amended his bankruptcy schedules on June 9, 2009, continuing to list the Suzuki on

27 Schedule D as an asset for which he intended to surrender his interest.  *See* Amended Schedules D, I, and J to Petition, BK Doc. 45, June 9, 2009 ("Amended Schedules"), **Exhibit 4**.

28 [13] Hogue Depo, 66:7-16.
[14] *Id.* at 63:17-21.

- 5 -

but at some point stopped after he lost his job and the Suzuki broke down in the Summer of 2009.[15]  About 4-5 weeks after that, Richard received a letter stating that the Suzuki had been towed to a towing company yard.[16]  As far as Richard was concerned, he had no more interest in the Suzuki, and as far as he knew, Silver State could have retrieved it whenever they wanted.[17]

### C.  Silver State takes the loan out of bankruptcy, repossesses the car, and terminates its relationship with Richard.

3.      Based on this understanding of his contractual rights, Richard proceeded with his bankruptcy.  On October 29, 2009, the Bankruptcy Court entered an order confirming Richard's plan #5, which listed his interest in the Suzuki as a "secured claim satisfied by the surrender of collateral."[18]  Thereon, he listed the interest in the Suzuki as voluntarily surrendered,[19] as he did not have possession of the vehicle.[20]  Silver State's internal records show it received notice of the plan, although it appeared confused by the plan, as it claimed it was listed as "surrendered," not that Richard would be "surrendering" his interest.[21]

4.      On December 21, 2009, after the Court entered its order confirming Richard's plan, Silver State subsequently moved for relief from the automatic stay with respect to the Suzuki;[22] it re-urged its motion again in February 2010.[23]  On March 16, 2010, the Court granted Silver State's re-urged motion, which permitted Silver State to "exercise all legal rights *with respect to its collateral*," but said nothing about Richard's *personal* responsibility for the debt.[24]  On March 25, 2009, the Court entered an order approving a modified Chapter 13 plan, which again indicated that Richard would be "surrendering" his interest in the vehicle.[25]  Silver State it subsequently repossessed the vehicle and auctioned it off on April 15, 2010.[26]

---

[15] *Id.* at 63:22-64:24.
[16] *Id.* at 67:3-7.
[17] *Id.* at 95:23-96:7.
[18] Order Confirming the Debtors Plan # 5, BK Doc. 65, Oct. 29, 2009 ("Oct. 2009 Confirmed Plan"), at 5-6, **Exhibit 5.**
[19] Hogue Depo, 78:22-79:3; Oct. 2009 Confirmed Plan, at 5-6.
[20] *Id.* at 83:16-21.
[21] Workflow History, at 3 (11/17/2009 entry).  Silver State appears to have caught its mistake later, as a 2/16/2010 entry in the "Workflow History" indicates that "per notes member is surrendering vehicle." *Id.*
[22] Motion for Relief from the Automatic Stay, BK Doc. 76, Dec. 21, 2009 ("First Silver State Motion"), **Exhibit 6.**
[23] Amended as to Date Motion for Relief from the Automatic Stay, BK Doc. 84, Feb. 5, 2010 ("Second Silver State Motion"), **Exhibit 7.**
[24] Order for Relief from the Automatic Stay, BK Doc. 98, Mar. 16, 2010 ("Stay Order") (emphasis added), **Exhibit 8.**
[25] Order Confirming the Debtors Plan # 7, BK Doc. 99, Mar. 25, 2009 ("Mar. 2010 Confirmed Plan"), **Exhibit 9.**
[26] Workflow History, at 2 (4/20/2010 entry).

5.      Thereafter, Richard completed his bankruptcy.   The Chapter 13 Standing Trustee's Final Report lists his Silver State interest as "surrendered."[27]   On March 30, 2014, Richard earned his Chapter 13 bankruptcy discharge, which Silver State acknowledged.[28]

**D. After Richard completes his bankruptcy, he obtains his Experian credit report, and disputes information contained thereon.**

6.      Thereafter, Richard pulled his Experian credit report on April 28, 2015, in order to determine if his reporting was accurate or if anyone was using his credit information.[29]   On the credit report, he discovered that Silver State reported that his account reported a "status" of "included in bankruptcy," and under the "account history," that it had been "discharged Through BK Ch 7, 11, or 12 on Apr 30, 2010."[30]   Under the "payment history," Silver State reported a slew of post-petition late payments from June 2009 through February 2010: 30 days late in June, 60 days in July, 90 days in August, 120 days in September, 150 days in October, and 180 days late in every month from November 2009 through February 2010.[31]   Finally, in March 2010, Silver State reported that the collateral had been "voluntarily surrendered."[32]

7.      On July 17, 2015, Richard disputed his information with Experian.[33]   Thereon, Richard requested that certain information be corrected.  Specifically, Richard asked that the late payments following the filing of Richard's bankruptcy be removed, and if they were not removed, he requested that a 100-word statement be included on his account "of all the disputed information contained in this letter regarding this account."[34]   Richard testified that he believed the "status" of his bankruptcy should report from the date he'd filed bankruptcy.[35]   He also testified that he did not believe the "recent balance" should have been "May of 2014," because

---

[27] Chapter 13 Final Account and Report – Completed, BK Doc. 138, Apr. 14, 2014 ("Trustee's Report") at 2, **Exhibit 10.**

[28] Discharge of Debtor after Completion of Chapter 13 Plan, BK Doc. 141, May 30, 2014 ("Discharge Order"), at 1, **Exhibit 11**; Defendant Silver State Schools Credit Union's Responses to Plaintiff's First Set of Requests for Admission, Sept. 15, 2016 ("RFA Responses"), at 9, **Exhibit 25**.

[29] Hogue Depo, 118:19-119:1; Dispute to Experian, comprised of: (1) July 17, 2015 Letter to Experian, RHOGUE0073-79 ("Letter"), Apr. 28, 2015 Experian Credit Report, No. 3348-0866-81, RHOGUE0080-105 ("Report"), Docket from U.S. Bankruptcy Court, No. 09-11367-btb, RHOGUE0106-127 ("Docket") and Driver's License for Richard Hogue, RHOGUE0128 ("License") (collectively, the "Dispute"), **Exhibit 12**.

[30] Report at 7 of 24.

[31] *Id.*

[32] *Id.*

[33] Hogue Depo, 150:10-151:25; *see also* Dispute, at 1, 6.

[34] *See* Dispute, at 6.

[35] Hogue Depo, 184:4-19; *see also* Dispute, at 6.

this did not date from the date of the bankruptcy was filed.[36]

**E. Silver State receives notification of Richard's dispute from Experian.**

8.      After receiving notification of Richard's dispute, Experian forwarded the same to Silver State via an Automated Credit Dispute Verification ("ACDV").[37]   Experian also sent Silver State Mr. Hogue's dispute, Experian credit report, and identifying information, as demonstrated by a "Y" notation near the top of the ACDV.[38]   While Silver State was supposed to keep a copy of this additional correspondence, it had failed to do so in this case.[39]   However, Silver State testified that it had a copy of the consumer dispute Richard had sent via Experian,[40] and also admitted it had received notice to Richard's dispute in discovery.[41]

**F. Silver State's Receipt of Richard's Dispute**

9.      Experian sent its ACDV to Silver State through an online platform known as e-Oscar.[42]   An ACDV is the only way Silver State receives notification of consumer disputes from CRAs like Experian,[43] in part because an ACDV, as opposed to other notices, provides a noticed date.[44]   The ACDV "queue" in e-Oscar also requires different access credentials and security protocols than other "queues."[45]   When receiving an ACDV, Silver State receives a view of how the disputed trade line is being reported, as well as the information which the consumer wants reviewed.[46]   Silver State would also receive a copy of the dispute letter and additional

---

[36] Hogue Depo, 187:16-188:11; *see also* Dispute, at 6.

[37] Feb. 3, 2017 Deposition of Tracy Meyer as Silver State Schools Credit Union's 30(b)(6) witness ("Silver State Depo"), at 57:23-58:16; 169:12-170:10, **Exhibit 21**. *See also* August 3, 2016 ACDV Response from Silver State to Experian, SSSCU000099 ("ACDV Response"), **Exhibit 13**.

[38] Silver State Depo, 236:11-237:14; *see also* ACDV Response, at 1 (noting that a "Y" appears on "Document Viewed" portion of ACDV; Excerpts from Feb. 24, 2017 deposition of Anna Simmons as Experian's 30(b)(6) witness in *Travers v. State Collection Services, Inc. et al.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 93-21 (D. Nev. July 3, 2017) ("Travers Experian Depo"), at 162:21-165:8 (noting that additional information has been attached by Experian to the ACDV it sends to data furnishers), **Exhibit 23**.  Silver State is an active party to the *Travers* case, appeared at the deposition in question, and had an opportunity to raise objections at this Experian deposition.  *See id.*; Fed. R. Civ. Proc. 32(a)(3); Fed. R. Evid. 801(d).

[39] Silver State Depo, at 237:2-18.

[40] *Id.* at 95:22-97:10; ACDV Response.

[41] RFA Responses, at 10.

[42] Silver State Depo, 25:5-12; 44:11-22

[43] *Id.* at 58:17-59:6.

[44] *Id.* at 64:6-19.  Silver State testified that it would not respond to notifications other than ACDVs, and thus its internal policies and procedures were designed to handle ACDVs that came over e-Oscar, not other notifications. *See id.* at 66:9-67:8.

[45] *Id.* at 65:15-25.

[46] *Id.* at 45:21-47:18.

information, if the CRA chose to send it on (as Experian had done here).[47]  Once Silver State completed its investigation of the consumer's account, it would send back an ACDV response to the CRA who originally sent the ACDV in question.[48]  Silver State testified that its policy is to archive a copy of an ACDV response just prior to its submission back to the CRA through e-Oscar, but in this case Silver State yet again failed to keep a record of Richard's draft ACDV response.[49]

**G.  Silver State's has no evidence of its policies and procedures.**

10.     To respond to credit disputes, Silver State relies on a nine-page internal document called a "Lending Manual."[50]  Silver State also refers to an industry-wide resource known as the Credit Reporting Resource Guide ("CRRG").[51]  Along with providing guidance regarding proper reporting in many scenarios, the CCRG contains a list of industry-specific codes, known as the "Metro 2,"[52] which Silver State uses to respond to ACDV responses for accounts included in bankruptcy.[53]

11.     However, Silver State could not establish the evidentiary foundation of any of its claimed policies and procedures.  As to the CRRG, Silver State testified that it had destroyed the applicable copy of the CRRG prior to the deposition and no longer had a copy of it in its obtainable records.[54]  As to its use of e-Oscar and relationship with Experian, the CRRG's "user obligations" require that Silver State "agree to assume all responsibility concerning your use of the CRRG, including meeting any requirements or obligations of your contracts with third parties."[55]  In

---

[47] *Id.* at 49:9-23.
[48] *Id.* at 73:6-12.
[49] *Id.* at 91:18-92:25.  Silver State also archives AUDs, and none were sent in this case.  *Id.* at 93:7-15.  In contrast, Silver State does not archive DR Notifications.  *Id.* at 93:2-6.  The parties obtained an actual ACDV Response from Experian.  *See* ACDV Response.
[50] *Id.* at 72:13-20; SSSCU Lending Manual, May 8, 2015, SSSCU000075-83 ("Lending Manual") (sealed), **Exhibit 18**.
[51] Silver State Depo, 33:12-21; *see also* 2013 Consumer Reporting Resource Guide, EXP_RHOGUE_000946-001199 ("CRRG") (sealed), **Exhibit 19**.
[52] Silver State Depo, 35:8-36:7.
[53] *Id.* at 126:9-12.  Silver Sate testified that she believed Experian uses the Metro 2 format, and Silver State believed, based on observations of Experian credit reporting, that they followed the CRRG reporting guidelines generally, and was not aware of any instance where Experian did not rely on either the Metro 2 format or the CRRG guidelines.  *Id.* at 134:6-14; 135:7-15.  Silver State's witness also testified that she believed Experian had helped create the CRRG.  *Id.* at 136:19-22.
[54] *Id.* at 39:22-41:12.  While Silver State indicated that it could "try" to find a copy of the applicable CDIA, it never confirmed whether it had actually done so.  *See id.* at 40:13-41:12.
[55] 2013 CRRG, at pg. i.

other related cases, Silver State claims to have a written contract with Experian;[56] but the best evidence Silver State could produce was a three-page, sixteen-year-old "Subscriber Service Agreement," which Experian had not signed.[57]  The agreement purported to require Silver State to furnish accurate data to Experian,[58] although Experian would not guarantee that the data in its own files, or any information it provided to Silver State, would be accurate.[59]

12.     In other cases, Silver State has acknowledged that it only receives consumer dispute from CRAs through e-Oscar.[60]  Silver State's May 2015 internal credit-dispute policy[61] provides e-Oscar screen shots "[t]o show a step by step how to respond to a dispute on the e-Oscar system."[62]  However, Silver State could not locate a copy of its written contract with e-Oscar,[63] and in fact could only speculate whether any contract had ever been entered in to; thus, its 30(b)(6) witness could not ultimately testify whether there were any restrictions on its use of e-Oscar at all. [64]  The best she could say was that if Silver State had any agreement with e-Oscar at all, the agreement would have been entered into in 2003.[65]  Silver State was unable to state whether it was able to refer back to a copy of its written agreement with e-Oscar when it designed its internal credit-dispute policies and procedures in 2015.[66]

**H.  Silver State's ACDV Response contains errors.**

13.     When evaluating a Chapter 13 dispute like Richard's, Silver State would look at his bankruptcy petition, the relevant schedules, the docket report, and the discharge, as well as

---

[56] March 6, 2017 Deposition of Tracy Meyer as Silver State Schools Credit Union's 30(b)(6) witness in *Travers v. State Collection Services, Inc. et al.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 93-26 (D. Nev. July 3, 2017) ("Travers Silver State Depo"), at 53:6-14, **Exhibit 24**.  *See* Fed. R. Civ. Proc. 32(a)(3); Fed. R. Evid. 801(d).  Silver State claims to have a contractual relationship with each of the four CRAs it reports data to (Equifax, Trans Union, Experian, and Innovis).  *See id.*

[57] Travers Silver State Depo, 53:15-67:19;  *see also* Nov. 21, 2000 Subscriber Service Agreement, SSSCU000133-135 ("Subscriber Agreement") (sealed), **Exhibit 20**.

[58] *Id.* at 61:17-62:12; *See* Subscriber Agreement.

[59] *Id.* at 60:15-61:15; 66:23-67:15; *See* Subscriber Agreement.

[60] *Id.* at 52:2-7.

[61] *Id.* at 46:3-6.

[62] *Id.* at 47:15-21.

[63] *Id.* at 48:15-51:14.  Ms. Meyer noted that in her personal experience, an entity named "OLDE" was the entity whom data furnishers would agree to terms and conditions with in order to access the e-Oscar system.  *Id.* at 48:49:18.

[64] *Id.* at 44:3-51:14.

[65] *Id.* at 51:15-20.

[66] *Id.* at 46:7-48:1.

relevant bankruptcy documents.[67]   Silver State acknowledged that Richard's October 29, 2009 plan of reorganization included an entry that Richard was "surrendering interest" in Daniel's Suzuki Verona.[68]   Silver State also acknowledged that it had filed an amended motion for relief of the automatic stay months after the entry of the plan of reorganization, on February 5, 2010.[69]   Silver State also acknowledged that the Bankruptcy Court had entered an order granting relief from the automatic stay on March 16, 2010.[70]   Silver State claimed that the order permitted it to exercise lien enforcement, but not collections,[71] and that the Trustee's Final Report indicated that Richard's interest had been surrendered.[72]

14.     Silver State submitted an ACDV response to Experian on August 3, 2016.[73] Thereon, they reported a response code of "02 – modify account information as indicated."[74]   In their response, they reported an "original delinquency date" of January 2009, the date of Richard's Chapter 13 petition, but left the subsequent late payments from June 2009 through February 2009, as well as the "voluntary surrender" notation, in place without changing them.[75] Paradoxically, Silver State took it upon itself to report a "closed date" of April 2010 – one month *after* the interest was voluntarily surrendered – and then placed a "balance date" more than five years after, on 5/30/2014 – the date of the bankruptcy discharge.[76]   Silver State also reported Richard's account with a status of "L," which meant "charge off."[77]   Silver State acknowledged that it could report a "charge off" only once, and that any derogatory reporting would continue for seven years after the first "charge off" entry.[78]

## I.   Richard's Experian Reinvestigation Contains Errors.

15.     On August 20, 2015, Richard received his reinvestigation results from Experian,

---

[67] Silver State Depo, 144:7-145:17.  Because Silver State organizes accounts by a generic "member number," when it receives a dispute containing only a partial and non-descriptive member number, it will investigate all of the members' accounts to ensure accurate reporting.  *Id.* at 97:11-99:1.

[68] *Id.* at 154:1-156:19.

[69] *Id.* at 156:20-157:10.

[70] *Id.* at 157:21-157.

[71] *Id.* at 158:22-159-22.

[72] *Id.* at 168:11-169:3.

[73] *Id.* at 169:12-170:14; ACDV Response.

[74] ACDV Response.

[75] *Id.*

[76] *Id.*

[77] Silver State Depo, 194:6-21.

[78] *Id.* at 194:16-197:2.

which indicated that a pair of Silver State accounts had been "updated" (even though he'd only disputed one).[79]  For the Silver State account Richard specified in his Dispute letter, Silver State account had not included a statement of dispute as he'd requested.[80]  On the account, Silver State rereported the post-petition bankruptcy late payments from June 2009 through February 2010, with the account being "voluntarily surrendered" in March 2010.[81]  This occurred despite the fact that the "account history" section of the credit report also indicated, "Debt *included* in Chapter 13 Bankruptcy on May 30, 2014," without an indication as to whether that was the discharge date or the petition date.  Silver State's witness testified that she believed "included" meant "part of," but that "discharged" meant "to do away with."[82]  There was no indication whether the May 30, 2014 date pertained to the date of Richard's petition, or his discharge – and thus no indication how long the account would continue reporting negatively on Richard's account.[83]

16.     Paradoxically, Silver State testified that it had updated the "balance date" to May 30, 2014, and that that date represented "the last time that there was a change in the balance and that there was no reporting of the balance after that date."[84]  Silver State's witness also testified that she had used the May 30, 2014 date because "I wanted to ensure that this stated that this was a zero balance as of that date, May 30, 2014," and to ensure the account balance would be zero as of a certain time – which in fact was reported.[85]  Yet, in the "account history" section of Richard's reinvestigation, Silver State now reported "account balances" of $11,834 *every month* from August 2013 through May 2015 – despite the fact that the account had been "closed" in April 2010, and Richard's bankruptcy had been discharged on May 30, 2014.[86]  Silver State's internal records showed a "balance" still owing on the account for many of these post-surrender, post-discharge months, but the amount in their records didn't even match the "balances" listed

---

[79] Hogue Depo, 178:4-179:2; August 20, 2015 Reinvestigation from Experian, Report No. 3488-0202-41, ("Reinvestigation"), at 2 of 20, **Exhibit 14**.  The Reinvestigation also contained an "update" to another Silver State account Richard held but which he had not disputed; there is no evidence of this "update" elsewhere on the Reinvestigation.  *See id.*  The Reinvestigation has been produced in more legible, color format; a black-and-white copy of the partial reinvestigation, which shows the disputed Silver State reporting, is appended to it.
[80] Reinvestigation, at 6.
[81] Silver State Depo, 206:8-207:6; ACDV Response; Reinvestigation, at 6 of 20.
[82] Silver State Depo, 215:8-17; Reinvestigation, at 6 of 20.
[83] *See* Reinvestigation, at 6.
[84] Silver State Depo, 204:10-205:4.
[85] Silver State Depo, 212:1-11; Reinvestigation, at 6 of 20.
[86] Silver State Depo, 241:3-16; Reinvestigation, at 6 of 20.

on the "account history" it had reported to Experian.[87]  Silver State's 30(b)(6) witness acknowledged the discrepancy, but could not explain it.[88]  Silver State also acknowledged that its internal records show the presence of ten entries which state, "send checking demand letter" – all of which were dated after Richard's bankruptcy discharge.[89]  Again, Silver State's witness could not explain what these letters were, what content they contained, or whether they'd even been sent out.[90]

17.     Silver State's 30(b)(6) witness also acknowledged that Richard's dispute asked for the inclusion of a 100-word statement in the event the account was not deleted, but indicated that it was not Silver State's policy to provide such information on a dispute it obtained from a credit reporting agency, claiming that they could not add such a dispute because there was no provision for one in an ACDV response.[91]

**J.  Richard sues Silver State, and Silver State retaliates.**

18.     On July 11, 2016, Richard sued Silver State.[92]  In response, Silver State pulled a particular Experian consumer report, called a "bullseye," in order to "to make sure that the dispute [Silver State] answered was really what they reported, because [Silver State] was surprised that we were getting served with a complaint after answering the dispute."[93]  Silver State also sent emails to Experian, expressing confusion over why the account was not reporting anymore, contending that it had reported a charge-off of "L" and did not want this negative account to have been removed from Richard's credit report.[94]

**K.  Subsequent evidence indicates that Silver State did not notify all other data furnishers of the results of its Experian investigation.**

19.     Silver State also testified that it does not send out an Automated Universal

---

[87] Silver State Depo, 241:17-244:5; Reinvestigation, at 6 of 20; Workflow History, at 1-2.
[88] Silver State Depo, 241:17-244:5; Reinvestigation, at 6 of 20; Workflow History, at 1-2.
[89] Silver State Depo, 244:19-249:3; Workflow History, at 1-2.
[90] Silver State Depo, 245:4-249:21.
[91] *Id.* at 107:6-113:18.
[92] ECF Dkt. 1.
[93] Silver State Depo, 216:25-217:3; July 21, 2016 Experian Bullseye, SSSCU000071 ("Bullseye"), July 21, 2016 Equifax Automated Data View Report, SSSCU000072 ("Data View Report"), and Emails from Tracy Meyer to Experian, SSSCU000073-74 ("Emails") (collectively, "Silver State Post-Investigation Inquiry"), **Exhibit 15**. Silver State testified that Silver State had received an ACDV from a credit bureau after the filing of a complaint on at least one occasion.  Silver State Depo, 221:13-17.
[94] Silver State Depo, 216:25-217:3; Silver State Post-Investigation Inquiry.

Dataform ("AUD") when completing the ACDV process.[95]   Silver State's witness did not indicate whether its ACDV response to Experian would be sent back to the other credit reporting agencies, in the event Silver State modified the information on a consumer's account (as it had done here).[96]   In fact, Silver State had no idea what changes, if any, Experian was authorized to make without notifying Silver State first.[97]

20.    However, in this case the evidence suggests that Silver State did not notify all of the other CRAs to whom it reports data of its report of reinvestigation.  For example, while the Silver State account thankfully disappeared from Richard's October 16, 2016 Experian credit report,[98] on Richard's January 16, 2017 Trans Union credit report, Richard's account was still being reported as "closed" with a "high balance" of $13,023, and a "last payment made" on March 10, 2011.[99]   Silver State's 30(b)(6) witness had no explanation for why Trans Union had reported the Silver State account in January 2017, although she acknowledged that the account would report for seven years from March 2010.[100]   According to the Trans Union Report, the account had been last updated in on July 31, 2015.[101]   This was several days before Silver State responded to Experian's dispute notice, as Silver State's ACDV response was dated August 3, 2015.[102]

21.    Silver State has testified in other cases that the results of its investigation are sent, if at all, to other CRAs when it send the ACDV response – but not before,[103] and considers its investigation over once it submitted its ACDV response.[104]   This, it is not possible that Silver State could have transmitted its Experian reinvestigation to Trans Union, as 15 U.S.C. § 1681s-2(b)(1)(D) required.

---

[95] Silver State Depo, at 74:3-6.
[96] *See id.* at 73:3-74:24 ("Well, we sent it through e-Oscar.  E-Oscar sends it back to the originating CRA, right.").
[97] *Id.* at 61:23-62:8.
[98] Hogue Depo, 210:21-211:23; October 17, 2016 Experian Credit Report, No. 2035-2841-62, EXP/RHogue000001-24 ("Oct. 2016 Experian Report"), **Exhibit 16**.
[99] Hogue Depo, 302:2-303:5 (cross-examination); Silver State Depo, 264:8-267:24; January 16, 2017 Trans Union Credit Report, File No. 332568055, HOGUE00221-0240 ("Jan. 2017 Trans Union Report"), at 9 of 20, **Exhibit 17**.
[100] Silver State Depo, 264:8-267:24; Jan. 2017 Trans Union Report, at 9.
[101] Silver State Depo, 264:8-267:24; Jan. 2017 Trans Union Report, at 9.
[102] *Compare* Jan. 2017 Trans Union Report, at 9, *with* ACDV Response.
[103] Silver State Depo, 73:3-19.
[104] Travers Silver State Depo, at 82:19-24.

**L.  Richard suffered damages, which a trier of fact will have to ascertain.**

22.     Moreover, and while not explicitly made part of this motion for partial summary judgment, Richard has suffered damages as a consequence of this negative reporting.  A willful FCRA violation results in an award of statutory damages and requires no showing of actual damages.[105]  For a negligent FCRA violation, Richard can show actual damages.

23.     Richard testified that he has suffered out-of-pocket expenses.[106]  Richard also testified that he has suffered exacerbation of prior medical conditions, and stress.[107]  Richard was also dissuaded or unable to apply for credit, and couldn't put his name on a home he and his wife had purchased, due to the reporting on his bankruptcy.[108]  For example, Richard believed that when he and his wife were shopping for a mortgage, they did not receive as competitive of an interest rate because he could not add his income to the loan application, which he would otherwise have liked to have signed.[109]  Ultimately, Richard was unable to place his name on the mortgage, with Richard's rejection being premised on the fact that a bankruptcy was still on his credit report.[110]  This caused Richard to be upset, as he could not contribute to a major family purchase and could not tell his son that he owned a home.[111]  The fact that Richard can't contribute has also led his wife to pay higher interest rates, and meant that the house was in his wife's name only.[112]

24.     Richard also feared the consequences of having the negative entries on his credit report, as this may have a direct impact on his future employment.  Richard currently has a job working for the federal government, which requires a security clearance and a federal background check every five years.[113]  The background check is a harrowing experience in which agents from the Federal Bureau of Investigation pour over his background information, including his credit report.[114]  At his last background check in 2012, Richard recalls federal

---

[105] 15 U.S.C. § 1681n.
[106] Hogue Depo, 246:11-19.
[107] *Id.* at 246:21-247:17.
[108] *Id.* at 31:23-32:2.
[109] *Id.* at 314:11-23 (cross examination).
[110] *Id.* at 316:17-319:12.
[111] *Id.* at 316:17-319:12.
[112] *Id.* at 313:17-315:14; 316:16-319:12 (cross examination).
[113] *Id.* at 34:20-21 (direct examination); 256:20-259:23 (cross examination).
[114] *Id.* at 256:20- 258:11 (cross examination).

agents paying specific attention to derogatory entries.  Depending on when his Silver State account was first "derogatory," the information either would or wouldn't appear on his credit report during his 2017 background check.  If the seven-year derogatory clock begins running from the date of Richard's bankruptcy petition, or even the date he surrendered the collateral to Silver State, it will be "aged off" his credit report by the time FBI agents review it again.  But if the clock began running from the date of Richard's bankruptcy discharge in 2014, then the account would stay there until 2021, and might subject Richard to additional, undeserved employment-related scrutiny.[115]

25.    Richard believed that his bankruptcy, and any accounts included therein, should have aged off of his credit report seven years from the date of his petition, or in January 2016.[116] Silver State acknowledged that a negative entry would report for seven years after the date it was originally reported.[117]  In other cases, Silver State has admitted that having an account included in bankruptcy could adversely affect credit decisions.[118]

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[119]  Material facts are those that may affect the outcome of the case.[120]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[121]  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[122]  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."[123]

---

[115] *Id.* at 258:17-259:6.
[116] *Id.* at 259:11-23 (cross examination).
[117] Silver State Depo, at 202:12-14.
[118] Travers Silver State Depo, 147:6-148:21.
[119] Fed. R. Civ. P. 56(a).
[120] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[121] *Id.*
[122] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).
[123] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

- 16 -

In determining whether to grant or deny summary judgment, courts apply a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[124] In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[125] If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[126]

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists.[127] To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[128] In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.[129] Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.[130]

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.[131] The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."[132]

[124] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).
[125] *See Celotex*, 477 U.S. at 323–24.
[126] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).
[127] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[128] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).
[129] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).
[130] *See Celotex*, 477 U.S. at 324.
[131] *See Anderson*, 477 U.S. at 249.
[132] *Id.* at 255.

But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.[133]

## DISCUSSION

The FCRA imposes obligations on persons or entities, such as creditors, that "furnish" information to credit reporting agencies.[134] There are two components to a furnisher's obligations under Section 1681s-2 of the FCRA. Subsection (a) sets forth a furnisher's duty to report "accurate information" to the credit reporting agencies.[135] Subsection (b) sets forth a furnisher's duty to conduct an investigation in response to a notice of dispute from a credit reporting agency.[136] Although furnishers have obligations under both subsections, only subsection (b) contains a private right of action.[137]

"To state a claim against a furnisher under Section 1681s-2(b), a plaintiff must allege that: (1) [she] found an inaccuracy in [her] credit report; (2) he notified a credit reporting agency; (3) the credit reporting agency notified the furnisher of the information about the dispute; and (4) the furnisher failed to investigate the inaccuracies or otherwise failed to comply with the requirements of 15 U.S.C. § 1681s-2(b)(1)(A)-(E)."[138] When a furnisher receives notice of a consumer dispute, the furnisher has the duty to conduct a reasonable investigation to determine whether the disputed information is inaccurate, correct any items found to be incomplete or inaccurate, and report any corrections to all consumer reporting agencies to which it originally furnished the information.[139] Sections 1681n and 1681o provide a right of action that applies to Section 1681s-2(b)'s requirement for furnishers to investigate disputes and report inaccuracies.[140]

Notice of Richard's dispute is a prerequisite to establishing liability against Silver State pursuant to 15 U.S.C. § 1681s-2(b). Ostensibly for this reason, "Congress did provide a filtering

---

[133] *See id.* at 249–50.
[134] *See* 15 U.S.C. § 1681s-2.
[135] 15 U.S.C. § 1681s-2(a)(1)-(9).
[136] 15 U.S.C. § 1681s-2(b)(b)(1)-(2).
[137] *See Gorman v. Wolpoff & Abramson*, 584 F.3d 1147, 1162 (9th Cir. 2009).
[138] *Riekki v. Bank of America*, No. 2:15-cv-02312-GMN-VCF, 2016 WL 8737439, at *2 (D. Nev. June 10, 2016); *see also Gorman*, 584 F.3d at 1154 (9th Cir. 2009).
[139] *See* 15 U.S.C § 1681s-2(b)(1)(A)-(E).
[140] *Gorman*, 584 F.3d at 1154 (citing 15 U.S.C. §§ 1681s–2(c) and (d)).

mechanism in § 1681s-2(b) by making the disputatious consumer notify a CRA and setting up the CRA to receive notice of the investigation by the furnisher."[141]  This "filtering mechanism" is an "opportunity for the furnisher to save itself from liability by taking the steps required in § 1681s-2(b)."[142]  Thus, Richard's allegations may proceed on the presumption that a consumer reporting agency provided Silver State with notice of Richard's dispute in compliance with its statutory obligations under 15 U.S.C. § 1681i(a)(2).

"By its ordinary meaning, an "investigation"[143] requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute."[144]  "[T]he plain meaning of the term 'investigation' is a 'detailed inquiry or systematic examination,' which necessarily 'requires some degree of careful inquiry.'"[145]  And, "because the purpose of the provision is 'to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, a 'superficial, unreasonable inquir[y]' would hardly satisfy Congress' objective."  Once Richard notified Silver State of potential problems, through Experian, Silver State was not free to "also cabin[] the scope of the investigation once undertaken."[146]

For a willful violation, because the FCRA provides for money damages *in lieu* of actual damages in case of willful violations, a plaintiff doesn't need to prove damages and causation to maintain a Section 1681i cause of action.  Thus, Richard can prove either (i) damages and causation to get to negligence, or simply (ii) that the CRA's failure to reinvestigate reasonably was willful.[147]

Here, the facts establish each element: (1) Plaintiff's April 28, 2015 consumer report

---

[141] *Nelson v. Chase Manhattan Mortg.*, 282 F.3d 1057, 1059 (9th Cir. 2002).

[142] *Id.*

[143] The FCRA recognizes a distinction between the terms "investigation" and "reinvestigation" to the extent those terms reference the duties of a furnisher and CRA, respectively.  *Compare* 15 U.S.C. § 1681s-2(b) (referencing the furnisher's duty to *investigate* upon notice of dispute), *with* 15 U.S.C. § 1681i(a) (referencing a CRA's duty to *reinvestigate* upon notice of a dispute).  However, while the respective terms evince a different set of respective procedural duties, the crux of either set of duties may still be understood by the ordinary meaning of the term "investigation."

[144] *Gorman*, 584 F.3d at 1155 (adopting the rationale in *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 429–31 (4th Cir. 2004)).

[145] *Id.* (quoting *Johnson*, 357 F.3d at 430).

[146] *Id.*

[147] *Saenz v. Trans Union*, 621 F. Supp. 2d 1074, 1082 (D. Or. 2007).  The requirement that a FCRA plaintiff seeking to prove willfulness need not establish damages and causation has been recently supported by other courts in this District.  *See, e.g.*, *In re Ocwen Loan Servicing LLC Litig.*, --- F. Supp. 3d ----, No. 16-cv-200-MMD-WGC, 2017 WL 1289826, at *5 (D. Nev. Mar. 3, 2017) (considering violation of 15 U.S.C. § 1681b); *Smith v. One Nevada Credit Union*, No. 16-cv-2156-GMN-NJK, 2017 WL 2803169 (D. Nev. June 27, 2017) (interpreting *In re Ocwen*).

contained inaccuracies on his Silver State account,[148] (2) on July 17, 2015, Richard sent his Dispute to Experian, pointing out inaccuracies in Silver State's reporting;[149] (3) Experian forwarded on the dispute to Silver State,[150] and (4) Silver State failed to reasonably investigate the inaccuracies and comply with the requirements of the FCRA 15 U.S.C. § 1681s-2(b)(1)(A)-(E), by reporting inaccurate information, adding more inaccurate information, and failing to send the results of his investigation to other CRAs.[151]   Richard also incurred statutory damages, because Silver State's reporting was reckless and willful; in that scenario, he need not prove actual damages.[152]   But to the degree relevant, Richard's out-of-pocket expenses were caused by Silver State's negligently inaccurate reporting and rereporting.[153]   Establishing the elements of either a negligent or willful FCRA violation also entitles the plaintiff to an award of reasonable attorney's fees and costs.[154]

1. **Experian reported patently inaccurate information on Richard's consumer report.**

The Silver State tradeline, as reported by Experian on April 28, 2015, contained patently incorrect and materially misleading information.[155]   Specifically, Richard's Silver State account failed to reflect that it had been included in Chapter 13 bankruptcy; instead it reported that the account had been "Discharged Though BK Ch 7, 11, or 12 on Apr 3, 2010."[156]   Silver State also reported post-petition, post-plan-confirmation late payment amounts from June 2009-March 2010, culminating in a notation that the collateral had been "voluntarily surrendered" in March 2010.[157]

2. **Richard notified Experian of the dispute.**

Richard notified Experian of the dispute on July 17, 2015.[158]   Richard attached his April 28, 2015 report from Experian, along with pages from his Chapter 13 bankruptcy docket and appropriate identifying information.[159]   Richard also outlined the problems with his reporting as stemming from

---

[148] Statement of Undisputed Material Facts, *supra*, ("SUMF"), at ¶ 6.
[149] *Id.* at ¶ 7.
[150] *Id.* at ¶ 8.
[151] *Id.* at ¶¶ 14,-17, 19-21.
[152] *Id.* at ¶¶ 10-12, 18-22.
[153] *Id.* at ¶¶ 22-25.
[154] ECF Dkt. 1; 15 U.S.C. §§ 1681n, 1681o.
[155] *Id.* at ¶ 6.
[156] *Id.*
[157] *Id.*
[158] *Id.* at ¶ 7.
[159] *Id.*

the post-bankruptcy reporting, and indicated that the account was included in his bankruptcy – which was (1) not a Chapter 7, 11, or 12 bankruptcy, nor (2) had his debt been "included" therein in April 2010.[160]  Experian clearly received the dispute, as it submitted an ACDV to Silver State.[161]

### 3. Experian notified Silver State of the dispute.

Experian notified Silver State of Richard's Dispute by sending Silver State an ACDV, Richard's Dispute, and the other documents he'd attached to his Dispute, to Silver State.[162]  Silver State submitted an ACDV response to Richard's Dispute.[163]

### 4. Silver State failed to reasonably investigate the inaccuracies and comply with the requirements of 15 U.S.C. § 1681s-2(b)(1)(A)-(E).

#### A. Silver State reported patently incorrect information to Experian.

"[An item in a consumer's file can be "'incomplete or inaccurate' . . . 'because it is patently incorrect. . . .'"[164]  "[I]nformation that is inaccurate 'on its face,' is 'patently incorrect.'"[165]  Thus, "representations that Plaintiff still owed a debt and its implication that the debt might still be collectible following the bankruptcy discharge [are] inaccurate."[166]

A confirmed Chapter 13 plan controls for the purpose of correctly reporting credit performance, and failure to report payment obligations consistent with the confirmed plan is patently incorrect.  The Bankruptcy Code, 11 U.S.C. § 1327(a), provides that "[t]he provisions of a confirmed plan *bind the debtor and each creditor. . . .*"[167]  Recently, the United States Supreme Court held:

> Confirmation has preclusive effect, foreclosing relitigation of "any issue actually litigated by the parties and any issue necessarily determined by the confirmation order." 8 Collier ¶ 1327.02[1][c], at 1327–6; *see also United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 275, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) (finding a confirmation order "enforceable and binding" on a creditor notwithstanding legal error when the creditor "had notice of the error and failed to object or timely

---

[160] *Id.*
[161] *Id.* at ¶¶ 7-8.
[162] *Id.* at ¶¶ 8, 14.
[163] *Id.* at ¶¶ 8, 14.
[164] *Carvalho v. Equifax,* 629 F.3d 876, 890 (9th Cir. 2010) (quoting *Gorman,* 584 F.3d at 1163).
[165] *Drew v. Equifax,* 690 F.3d 1100, 1108 (9th Cir. 2012) (quoting *Carvalho,* 629 F.3d at 891).
[166] *Riekki v. Bank of America,* 2:15-cv-02312-GMN-VCF, Doc. 57 at 4 (D. Nev. June 10, 2016) (denying furnisher's motion to dismiss); *Polvorosa v. Allied Collection Serv.,* No. 2:16-cv-1508-JCM-CWH, 2017 WL 29331, at *4 (D. Nev. Jan. 3, 2017) (denying furnisher's motion to dismiss and holding that reporting derogatory information during and bankruptcy and contrary to debtor's payment performance during the pendency of the bankruptcy sufficient to state a claim for inaccurate reporting).
[167] 11 U.S.C. § 1327(a) (emphasis added).

appeal"). Subject to certain exceptions, confirmation "vests all of the property of the [bankruptcy] estate in the debtor," and renders that property "free and clear of any claim or interest of any creditor provided for by the plan." §§ 1327(b), (c).[168]

Thus, the "order confirming a chapter 13 plan is binding, and res judicata precludes a creditor from bringing a collateral attack of that order."[169]  "The reason for this is simple and mirrors the general justification for *res judicata* principles-after the affected parties have an opportunity to present their arguments and claims, it is cumbersome and inefficient to allow those same parties to revisit or recharacterize the identical problems in a subsequent proceeding."[170] "This is especially true in the bankruptcy context, where a confirmed plan acts more or less like a court-approved contract or consent decree that binds both the debtor and all the creditors."[171]

Here, Richard's Silver State account was subject to the controlling terms of his confirmed plan because Richard included the account on his January 31, 2009 bankruptcy petition, thus any derogatory information reported on these tradelines after the petition date could only be reported, if at all, if Richard failed to meet his obligations under the plan.  Neither the trustee, nor any party in interest opposed plan confirmation or sought dismissal or conversion based on non-payment under the confirmed plan.[172]  When the bankruptcy court entered its order confirming the plan, Silver State was bound by the plan's terms of repayment.  The bankruptcy court's order confirming the plan precludes any collateral attack of that order, at least until Silver State moved to and actually obtained an order lifting of the stay of the Court's order in March of 2010.  Even then, the order permitted Silver State to exercise its rights against the collateral *only*, not against Richard *personally*.[173]

In this context, Silver State's reporting that these debts had been "included in Chapter 13 Bankruptcy" on March 30, 2014 – the date of Richard's *discharge*, but not his *petition* – was patently incorrect.[174]  Moreover, although Silver State reported a "recent balance" of $0 as of May 2014, in the "payment history" section Silver State *continued to report post-discharge balances* of $11,834 in

---

[168] *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015) (holding that plan confirmation alters the status quo and fixes the rights of the parties).
[169] *In re Okosisi*, 451 B.R. 90, 100 (Bankr. D. Nev. 2011) (citing *In re Brawders*, 503 F.3d 856, 867 (9th Cir. 2007)).
[170] *In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000).
[171] *Id.*; *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) ("[A] plan [of reorganization] is essentially a contract between the debtor and his creditors, and must be interpreted according to the rules governing the interpretation of contracts." (citing *Hillis Motors v. Haw. Auto. Dealers Ass'n*, 997 F.2d 581, 588 (9th Cir.1993)).
[172] *See* SUMF, at ¶¶ 2-5.
[173] *In re Okosisi*, 451 B.R. at 100.
[174] *Id.*

- 22 -

every month from June 2014 through May of 2015.[175]  Put simply, the $0 balance and the post-discharge balance reporting cannot possibly both be correct.  Finally, Silver State's reporting of post-petition late payments from June 2009 through October 2009, and post-plan-confirmation payments between November 2009 and February 2010, was also patently incorrect,[176] as Silver State had knowledge of both Richard's Petition and October 2009 Confirmed Plan, as well as the fact that Richard agreed to "surrender" his interest in the collateral.[177]  Silver State only obtained an order lifting the stay months later, in March of 2010.

Silver State failed to conduct a reasonable investigation, failed to review all relevant information provided by Richard in his Dispute to Experian, and failed to correct and update Richard's information, as reflected in Silver State's ACDV response where Silver State included both the Chapter 13 bankruptcy indicator, and the "charge off" indicator.[178]  As a consequence of Silver State's reporting this patently incorrect information in its ACDV responses, Richard's Experian Reinvestigation rereported that the account had been "included" in Chapter 13 bankruptcy on the date of discharge, continued reporting derogatory post-petition payment history, and now included new post-discharge account balances in the "account history section – all while reporting the account as having a $0 balance.[179]  The information Silver State reported was patently incorrect, and had the consequence of appearing to "re-age" Richard's debt in violation of 15 U.S.C. § 1681c.

**B.  Silver State reported materially misleading information to Experian.**

Under the FCRA, a "materially misleading" statement is concerned with omissions to credit entries that in context create misperceptions about otherwise factually accurate data.[180]  "Materially misleading" means that information is misleading "in such a way and to such an extent that it can be expected to adversely affect credit decisions."[181]  "[I]nformation that is open to an interpretation that

---

[175] *See id.* at ¶ 16.
[176] *Id.*
[177] *Id.* at ¶¶ 2-3.
[178] *See id.* at ¶ 14.
[179] *Id.* at ¶¶ 14-17.
[180] *See, e.g., Gorman*, 584 F.3d at 1163 (9th Cir. 2009) (citing *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148-50 (4th Cir. 2008) ("Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading.")).
[181] 584 F.3d at 1163 (quoting *Sepulvado v. CSC Credit Servs*, 158 F.3d 890, 895 (5th Cir.1998)).

is directly contradictory to the true information is sufficiently misleading to qualify as inaccurate."[182]

A Plaintiff may establish that a Furnisher's failure to follow industry reporting guidelines are materially misleading where (1) the Furnisher adopts the standard, (2) the Furnisher deviated from the standard, and (3) this "deviation might adversely affect credit decisions—in other words, that entit[ies] would have expected [the defendant Furnisher] to report in compliance with the [2015 Metro 2] guidelines."[183]

Here, it is undisputed that Silver State adopted the standard, as it testified that the CRRG formed a part of its policies and procedures for reinvestigation.[184]   Silver State also deviated from the standard in reporting the bankruptcy information in question.  Here, the CRRG''s "Explanation and Examples of FCRA Compliance Date of First Delinquency (Field 25) indicates that "any other adverse item of information . . . which antedates the report by more than seven years" should be excluded from reporting.[185]   Since the bankruptcy petition would have been the first delinquent event, it was inaccurate and materially misleading for Silver State to report the debt as "included" in Chapter 13 bankruptcy on April 30, 2014.[186]

The CRRG's FAQ 28(a) also requires a data furnisher to report the "account status" at the time of petition (which based on the reporting would have been "current").[187]   Thus, by reporting post-petition late payments, Silver State also failed to follow the CRRG guidelines, which was both inaccurate and materially misleading.  Finally, because the account status at the time of Richard's petition was current, it was inaccurate for Silver State to report the account as a "charge-off."

These failures stemmed from the fact that Silver State's ACDV response inaccurately reported the account as both included in bankruptcy, and the fact the account had been "charged off." By failing to properly report data to Experian in its ACDV response, as Pages 5-42 and 6-19 of the CRRG required, Silver State deviated from the CRRG standards, and rendered the information materially misleading, and thus inaccurate.

Finally, it is clear that these entries might affect credit decisions; nothing on the face of

---

[182] *Toliver v. Experian*, 973 F. Supp. 2d 707, 715 (S.D. Tex. 2013) (citations and quotations omitted).
[183] *Nissou-Rabban v. Capital One Bank (USA)*, 2016 WL 4508241, at *5 (S.D. Cal. June 6, 2016) (citations and quotations omitted).
[184] SUMF, at ¶ 10.
[185] *See* SUMF, at ¶ 10; CRRG, page 5-42.
[186] *See* CRRG, page 5-42; *see also* 15 U.S.C. § 1681c.
[187] *See* SUMF, at ¶ 10; CRRG, page 6-19.

Experian's Reinvestigation indicated that the accounts would "age off" earlier than the bankruptcy-inclusion date, which Silver State's witness corroborated when she testified that the 7-year derogatory period would have run from the date the account was first listed as "charged off."[188] Silver State itself was surprised by this; when it pulled Richard's July 21, 2016 "Bullseye" consumer report from Experian, discovered the account was no longer reporting, it contacted Experian and asked why the account was no longer reporting, as Silver State had not directed Experian to remove it.[189]   Moreover, the Reinvestigation indicated the paradoxical "zero balance" as of May 2014, yet a steady stream of account post-discharge account balances, for which there was no meaningful explanation.[190]   Even if one of these notations is "correct," then the other cannot be – and both are inaccurate and materially misleading as a result.   Moreover, Silver State admitted elsewhere that having an account included in bankruptcy could adversely affect credit decisions.[191]

Even assuming *arguendo* that Silver State believes it was entitled to remove Richard's Suzuki from the bankruptcy and continue reporting on the account as if the bankruptcy never occurred, Silver State's the reporting was still derogatory because it continued to report that the Suzuki had been "included" in Chapter 13 bankruptcy on the date of the discharge, which would effectively re-age a debt on an asset which Silver State had reported that Richard voluntarily surrendered in April of 2010.[192]   And even if Silver State believed it was entitled to report this conflicting information, there is still no explanation at all for why it would have reported a $0 balance on the account in May 2014 when Richard received his discharged, while at the same time reporting post-discharge balances of $11,834 *every month* from May 2014 through May of 2015.

In sum, the reporting on Silver State's ACDV responses and the Experian Reinvestigation was materially misleading because it deviated from the CRRG reporting standards and simply does not make sense to either a future credit decision-maker, or to anyone with a passable grasp on the English language and a modicum of common sense.

---

[188] SUMF, at ¶ 13.
[189] *Id.* at ¶ 18.
[190] *Id.* at ¶¶ 15-16.
[191] *Id.* at ¶ 25.
[192] *Id.* at ¶¶ 15-16.

**C.  Silver State failed to properly notify all other CRAs of the results of its Experian investigation.**

15 U.S.C. § 1681s-2(b)(1)(D) requires that after completing an investigation which finds that information is incomplete or inaccurate, a data furnisher must "report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis."[193]  Silver State failed to do this after finding inaccuracies on Richard's Experian dispute.  Silver State's 30(b)(6) witness testified that it would transmit the results of its reinvestigation no earlier than the date of the ACDV, and Silver State sent its ACDV response to Experian on August 3, 2015.[194]  However, Richard's January 2017 Transunion credit report still lists the disputed tradeline, which it reports as "last updated" on July 31, 2015 – *before* Silver State sent the Experian ACDV.[195]

The January 2017 Transunion account, as reported, fails to indicate that the account was included in bankruptcy (and in fact should have "aged off" as of January 2016 as a result), but instead that the account contains a "high balance" of $13,023, and a "date closed" of March 31, 2010.[196]  Incidentally, Silver State's non-reporting also resulted in his account being reported with Trans Union for a longer period than it should have if the account had been dated from his January 2009 petition date.   In failing to send Transunion the results of its Experian reinvestigation, Silver State violated 15 U.S.C. § 1681s-2(b)(1)(D).

**5.  Richard suffered statutory damages, as Silver State's conduct was both reckless willful.**

Under the FCRA, a plaintiff may demonstrate willfulness by showing a reckless disregard of statutory duty, including 15 U.S.C. § 1681s-2(b).[197]  A defendant acts in reckless disregard if its action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."[198]  A defendant is liable if it takes action involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known."[199]  "The statutory

---

[193] *Id.*
[194] *Id.* at ¶¶ 19-21.
[195] *Id.*
[196] *Id.*
[197] *Safeco*, 551 U.S. at 56–60.
[198] *Bateman v. Am. Multi-Cinema*, 623 F.3d 708, 711 n.1 (9th Cir. 2010) (quoting *Safeco*, 551 U.S. at 69).  *See also Smith*, 2017 WL 2803169 (D. Nev. June 27, 2017).
[199] *Id.* (quoting *Safeco*, 551 U.S. at 68).

requirement of willfulness does not require proof of intent to cause harm, but only an intent to fail to comply with the FCRA."[200]   A consumer can recover punitive damages for willful non-compliance.[201]   "Courts in this circuit have found that '[w]illfullness under the FCRA is generally a question of fact for the jury.'"[202]

A consumer can recover punitive damages for willful non-compliance.[203] A denial of credit is not a prerequisite to recovery under the FCRA.[204]   "The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation."[205]   Under the FCRA, a plaintiff's out-of-pocket costs necessary for disputing a consumer report constitute cognizable economic damages.[206]

### A. Silver State's reporting of inaccurate and materially misleading information was reckless, as shown through its lackadaisical approach to its compliance obligations.

The undisputed facts easily establish that Silver State's actions were reckless.  The CRRG reporting guidelines, which Silver State admits it incorporated as part of its policies and procedures, required Silver State to "assume all responsibility concerning your use of the CRRG, including meeting any requirements or obligations of your contracts with third parties."[207]  Yet, in other cases, Silver State admits that it used e-Oscar, it could not find a written contract governing the terms of its engagement – and thus could not explain how, or under what circumstances, its reporting obligations would be triggered, or whether its own policies and procedures reflected them.  Indeed, Silver State could not confirm that it had a copy of the e-Oscar contract at the time it designed its own policies

[200] *Centuori v. Experian*, 431 F. Supp. 2d 1002, 1011 (D. Ariz. 2006)
[201] 15 U.S.C. § 1681n.
[202] *Taylor v. First Advantage Background Servs.*, 207 F. Supp. 3d 1095, 1110 (N.D. Cal. 2016) (quoting *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)) (citing *Guimond*, 45 F.3d at 1333).   *See also Heaton v. Soc. Fin.*, 2015 WL 6744525, at *6 n.5 (N.D. Cal. Nov. 4, 2015) ("The mixed nature of the willfulness inquiry—with issues of law and fact intertwined—is the precise reason the question is best reserved for a finder of fact.") (citing *Smith v. LexisNexis Screening Sols.*, 76 F. Supp. 3d 651, 665 (E.D. Mich. 2014)); *Fregoso v. Wells Fargo Dealer Servs.*, 2012 WL 4903291, at *7 (C.D. Cal. Oct. 16, 2012) (holding that in the context of willful violations of 15 U.S.C. § 1681s-2(b) of the FCRA, if the plaintiff succeeds in making his prima facie case, the furnisher must demonstrate legal certainty that it met all obligations to avoid having the reasonableness of its response qualify as a triable issue of fact).
[203] 15 U.S.C. § 1681n.
[204] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995).
[205] *Id.* (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.1983) (finding mental anguish recoverable in FCRA claims); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 514 (5th Cir. 1982); *Millstone v. O'Hanlon Reports*, 528 F.2d 829, 834–35 (8th Cir. 1976); *Bryant v. TRW*, 487 F. Supp. 1234, 1240 (E.D. Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982); *Jones v. Credit Bureau of Huntington*, 184 W.Va. 112, 117, (1990)); *see Drew*, 690 F.3d at 1109.
[206] *Saenz*, 621 F. Supp. 2d at 1085.
[207] SUMF, at ¶ 10; CRRG, page i.

and procedures, such that its reporting could conform to its conditions for use of the e-Oscar system.[208]

And as it related to Experian, Silver State could not even confirm that Experian and Silver State adhered to the same reporting guidelines.  Silver State could not confirm that it had a fully executed contract with Experian at all – because the sixteen-year-old, three-page "subscriber agreement" is signed only by Silver State, but not Experian.[209]  Without any fully executed contractual relationship with Experian, there is effectively nothing suggesting that Silver State was bound by any terms at all regarding its obligation to report data to Experian correctly, other than the FCRA itself.

Silver State's internal records were similarly in a state of confusion and disrepair.  Silver State had thrown out a copy of the relevant CRRG manual, and thus can't justifiably say that it relied in this guidance in responding to Richard's Experian dispute.  Silver State also disregarded its own policies regarding document retention, as it failed to save a copy of the draft ACDV response it sent regarding Richard's dispute, or any of Richard's dispute correspondence.[210]  Nor are Silver State's internal files consistent: Silver State admitted that its records regarding the amount "owed" on Richard's relevant Silver State account don't even match the post-discharge account-history reporting in Richard's Experian reinvestigation.  Silver State had no explanation for this discrepancy at all.[211]

In sum, the undisputed facts related to Silver State's lackadaisical approach to its own contractual agreements, its policies and procedures, and its internal record-keeping show that Silver State never took remotely adequate steps to confirm that it would accurately report data to credit reporting agencies, or reasonably and comprehensively investigate consumer disputes brought it its attention.  Silver State's fundamental and self-made failures show that it recklessly abdicated its statutory obligations to ensure the accurate reporting of data and thorough investigation of consumer disputes.  Silver State's failures were more than merely unreasonable; they were reckless.  By extension, for the purposes of the FCRA, they were willful.

---

[208] SUMF, at ¶¶ 10-12.
[209] *Id.* at ¶¶ 11.
[210] *Id.* at ¶¶ 8-9.
[211] *Id.* at ¶ 16.

**B. Silver State's conduct was willful because it reaffirmed its errors, even after it viewed the results of Experian's reinvestigation on Richard's Bullseye report.**

Silver State's July 21, 2016 "Bullseye" and Silver State's responses confirm that Silver State was surprised that Richard's account appears to have "aged off" in January 2016 – as Silver State's intention was to report the debt as "charged off," presumably in 2010 after the bankruptcy petition was filed.[212]   Thus, Silver State reaffirmed the fundamental error and deviation from the CRRG guidelines after it viewed the account, when Silver State should have at least acknowledged that the "charge off" notation was inaccurate under the CRRG's FAQ 28(a).[213]   Silver State's continual reporting of Richard's Silver State account on his Transunion credit report in January 2017 is further evidence of Silver State's willfulness.

**6.   The undisputed material facts satisfy the remaining factors to make out a negligent violation of 15 U.S.C. § 1681s-2(b)**

Even if the Court finds that Silver State's failure isn't willful, it's undisputedly negligent, and Richard's suffered actual damages in the form of out-of-pocket expenses.[214]   "The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation."[215]   Under the FCRA, a plaintiff's out-of-pocket costs necessary for disputing a consumer report constitute cognizable economic damages.[216]   A denial of credit isn't a prerequisite to FCRA recovery.[217]

At his deposition, also testified that he has been dissuaded or unable to apply for credit, and couldn't put his name on a home he and his wife had purchased, due to the reporting on his bankruptcy – causing Richard to be upset, as he could not contribute to a major family purchase and could not tell his son that he owned a home.[218]   The fact that Richard can't contribute has also led his wife to pay a higher interest rate, and meant that the house was in his wife's name

---

[212] *Id.* ¶ at 18.

[213] *Id.* at ¶ 10; CRRG, page 6-19.

[214] *Id.* at ¶ 23.

[215] *Id.* (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.1983) (finding mental anguish recoverable in FCRA claims); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 514 (5th Cir. 1982); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834–35 (8th Cir. 1976); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1240 (E.D. Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982); *Jones v. Credit Bureau of Huntington, Inc.*, 184 W.Va. 112, 117, (1990)); *see Drew*, 690 F.3d at 1109.

[216] *Saenz*, 621 F. Supp. 2d at 1085.   Richard's also incurred attorney's fees as a result of prosecuting this action. While again not a part of Richard's motion for partial summary judgment, and a categorical necessity if the Court finds that Silver State willfully or recklessly violated the FCRA, the Court may elect to find Richard's out-of-pocket damages "close out" Silver State's liability.

[217] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995).

[218] SUMF, at ¶ 23.

only.[219]  Silver State's suggested "re-aging" of his debt also caused Richard anxiety in that there was a heightened risk that his upcoming federal background check and necessary security clearance would be compromised if the seven year "re-aging" of his bankruptcy ran from any date other than his voluntary bankruptcy petition, and thus became a topic of conversation.   Finally, Richard suffered exacerbation of prior medical conditions, and stress.[220]   In sum, Richard has demonstrated his entitlement to a host of actual damages in the event of a mere negligent recovery against Silver State.

## CONCLUSION

For the foregoing reasons, Richard requests that his motion for partial summary judgment against Silver State be granted and that Silver State be found to have both negligently and willfully violated 15 U.S.C. § 1681s-2(b).  Richard's damages are properly reserved for trial.

Dated: July 10, 2017

Respectfully submitted,

/s/ Miles N. Clark
Matthew I. Knepper, Esq.
Miles N. Clark, Esq.
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Ste. 170-109
Las Vegas, NV 89129

David H. Krieger, Esq.
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123

Allison R. Schmidt, Esq.
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117

Attorneys for Plaintiff

---

[219] *Id.*
[220] *Id.* at ¶ 24.