David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, Nevada 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Allison R. Schmidt, Esq.
Nevada Bar No. 10743
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117
Phone: (702) 387-7222
Fax: (702) 387-7222
Email: Allison@nevadaslawyers.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

RICHARD B. HOGUE,

    Plaintiff,

        vs.

ALLIED COLLECTION SERVICE, INC;
SELENE FINANCE, LLC; MOUNTAIN
AMERICA CREDIT UNION; SILVER
STATE SCHOOLS CREDIT UNION; IBEW
PLUS CREDIT UNION; EQUIFAX
INFORMATION SERVICES, LLC;
EXPERIAN INFORMATION SOLUTIONS,
INC,

        Defendants.

CASE NO. **2:16-cv-01620-JCM-VCF**


**PLAINTIFF RICHARD HOGUE'S
RESPONSE TO DEFENDANT
SILVER STATE SCHOOLS CREDIT
UNION'S MOTION FOR SUMMARY
JUDGMENT**

Plaintiff Richard Hogue opposes all portions of Defendant Silver State Schools Credit Union's ("Silver State") motion for summary judgment.  This opposition is supported by the following memorandum of points and authorities, as well as the exhibits attached hereto and the other filings in this case, particularly Richard's motion for partial summary judgment against Silver State, which Richard incorporates by reference.

## INTRODUCTION

The undisputed facts demonstrate that a result of Silver State's investigation, it reported both a $0 balance "as of May 2014" *and* post-discharge reporting of a balance of $11,834 *every month* from June 2014 through May 2015.  These items of information cannot possibly both be right, and make out a patent inaccuracy for purposes of liability under 15 U.S.C. § 1681s-2(b).  But even if the court were to rule in favor of Silver State on each of its bases, Richard's FCRA claim will still reach the jury because Silver State fails to move on all of Richard's allegations.  Specifically, Silver State never moves on Richard's claim that Silver State violated 15 U.S.C. § 1681s-2(b)(1)(D) when it failed to notify Trans Union of the results of its Experian investigation.  Richard's damages also reach the jury, because Silver State failed to move for summary judgment on Richard's out-of-pocket damages, which Richard testified he suffered, or on any portion of Richard's willfulness claim – which, if proven at trial, entitles Richard to statutory damages without any further proof.  One way or another, Richard's claim will be in front of a jury.

Instead of addressing all of Richard's actual claims, Silver State uses most of its motion to make a series of legally defective arguments.  It first contends that the FCRA's definition of "consumer report" at 15 U.S.C. 1681a(d) only applies to a report sent to third parties for purposes of making credit decisions – an argument immediately refuted through review of subsections 1681a(d)(1)(B) and (C) of the statute, which Silver State purposefully omits.[1]

From this legally flawed premise, Silver State argues that it had no "duty" to investigate Richard's Experian dispute under 15 U.S.C. § 1681s-2(b), because the consumer disclosure Richard submitted to Experian with his dispute is not a "consumer report."  But as this Court has recently

---

[1] Silver State certainly believes in its purposeful misreading of Section 1681a(d) – so much so that it has sent a proposed Rule 11 letter to Richard's co-counsel Haines & Krieger and Knepper & Clark (as well as co-counsel Payne Law Firm LLC) in another case, *Travers v. Experian et al.*, No. 17-cv-1591-JCM-CWH (D. Nev.), in which it accuses co-counsel of violations of the Nevada Rules of Professional Conduct, premised in large part on this flawed statutory analysis.  Silver State notified counsel in the *Travers* matter of its intention to file this Rule 11 motion.

remarked in *Polvorosa v. Allied Collection Service, Inc.*[2] and *Pauli v. CIT Bank, N.A,*[3] FCRA liability for data furnishers for failing to properly investigate an account is predicated on submission of a consumer dispute through a CRA pursuant to section 1681i.  Indeed, Silver State's own 30(b)(6) rejected Silver State's new argument, testifying that CRAs do not always attach the disputing consumer's credit report along with their electronic notification – and that the absence of that information wouldn't stop investigation of the dispute.

Both this Court and Silver State's own 30(b)(6) witness recognize that Section 1681i does not require a consumer to submit a "*consumer report*" to trigger the dispute-investigation machinery. Instead, it provides in the broadest sense that a consumer may "dispute any item of information" in the "consumer's *file*,"[4] notice of which the CRA must then submit to a data furnisher like Silver State under Section 1681i(a)(2).  This notice triggers the furnisher's duty to conduct an investigation under Section 1681s-2(b).  The FCRA separately defines "consumer's file" and "consumer report,"[5] yet Silver State selectively omits the FCRA's definition of "file" in its motion.

Silver State also contends it had no "duty" to investigate because Experian's *reinvestigation* was not a "consumer report," even though Section 1681i(a)(6)(B)(ii) *requires* a CRA's report of reinvestigation to be provided as a "consumer report."  But the form Experian uses to submit its reinvestigation has no bearing on Silver State's preceding "duties" to investigate Richard's dispute under Section 1681s-2(b).  As recognized in *Polvorosa* and *Pauli*, a data furnisher, once *notified* by a CRA of a consumer dispute, has 30 days to conduct and complete an investigation into the disputed information, and then send the results of the investigation back to the data furnisher.  It is only *after* an investigation is returned that a CRA notifies the consumer of the results of the investigation and reinvestigation through a "consumer report" as Section 1681i(a)(6)(B)(ii) requires.

Silver State's other arguments fare no better.  Its claim that an "inaccuracy" does not exist on the credit report cannot be correct, because Silver State reported *both* pre-petition interests, as well as *post*-petition interests which either actually resulted in the reporting of the account longer than the 7-year period established under 1681c, or were materially misleading in suggesting the same.  Re-aging

---

[2] No. 16-cv-1508-JCM-CWH, 2017 WL 29331, at *4 (D. Nev. Jan. 3, 2017).
[3] No. 17-cv-167-JCM-VCF, 2017 WL 2381275, at *2 (D. Nev. June 1, 2017).
[4] 15 U.S.C. § 1681i(a).
[5] 15 U.S.C. §§ 1681a(d); 1681a(g).   The latter term is defined more broadly than the former.

Richard's debt is also contrary to the Court's conclusion in *Polvorosa* that post-discharge reporting of prepetition debt could be inaccurate.  Finally, Silver State claims that Richard can't prove damages – which Richard has not only testified to, but which Silver State seeks only dismissal in part.  In sum, Silver State's motion for summary judgment is incomplete, legally deficient, and must be denied.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On August 8, 2009, Richard co-signed a loan from Silver State Schools Credit Union with Daniel Harper, in order to finance the purchase of a used 2004 Suzuki Verona.[6]  Mr. Harper was Richard's cousin's daughter's boyfriend, who had been riding the bus for about a year.[7]  Richard's informal agreement would be that it would be Daniel's car,[8] and Daniel in fact acquired possession of it after the purchase.[9]  Consequently, it was agreed between Richard and Daniel that Daniel would make the payments on the car.[10]  Other than the test-drive, Richard never drove the car,[11] and he never even had a set of keys for it.[12]

2.      On January 31, 2009, Richard filed for Chapter 13 bankruptcy, after an injury left him unable to work and he was subsequently laid off from his job.[13]  Richard included the Suzuki on Schedule D of his Petition, stating the he intended to surrender his interest in the vehicle.[14]  Richard's understanding was that if Daniel wished to keep the car, he could continue making the payments.[15]  Daniel did make some of the payments after Richard filed bankruptcy,[16] but at some point stopped

---

[6] Excerpts from Feb. 10, 2017 Deposition of Richard Hogue ("Hogue Depo"), **Exhibit 22**, at 48:23-50:15; 52:3-16; August 9, 2008 Credit Application for Suzuki Verona and Kelly Blue Book Estimate, SSSCU000004-7 ("Application"), **Exhibit 1**; Silver State Workflow History from 1/1/2000 to 2/1/2017, SSSCU000116-119 ("Workflow History"), **Exhibit 2**.

[7] Hogue Depo, 16:22-17:9; 45:8-23.

[8] *Id.* at 54:4-14.

[9] *Id.* at 55:18-56:2.

[10] *See id.* at 56:17-21; 66:17-20.

[11] *Id.* at 56:4-21.

[12] *Id.* at 101:15:17.

[13] *Id.* at 57:16-24; Voluntary Petition for Chapter 13 Bankruptcy, Case No. 09-11367-btb, ECF Dkt. 1 (Bankr. D. Nev. Jan. 1, 2009) ("Petition"), **Exhibit 3**. Plaintiff requests this Court take judicial notice of any cited documents made in court filings as matters of public record, pursuant to Fed. R. Civ. P. 201(b). *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.11 (9th Cir. 2006) (citing *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)).

[14] Petition, at 17.  John amended his bankruptcy schedules on June 9, 2009, continuing to list the Suzuki on Schedule D as an asset for which he intended to surrender his interest.  *See* Amended Schedules D, I, and J to Petition, BK Doc. 45, June 9, 2009 ("Amended Schedules"), **Exhibit 4**.

[15] Hogue Depo, 66:7-16.

[16] *Id.* at 63:17-21.

after he lost his job and the Suzuki broke down in the Summer of 2009.[17] About 4-5 weeks after that, Richard received a letter stating that the Suzuki had been towed to a towing company yard.[18] As far as Richard was concerned, he had no more interest in the Suzuki, and as far as he knew, Silver State could have retrieved it whenever they wanted.[19]

3. Based on this understanding of his contractual rights, Richard proceeded with his bankruptcy. On October 29, 2009, the Bankruptcy Court entered an order confirming Richard's plan #5, which listed his interest in the Suzuki as a "secured claim satisfied by the surrender of collateral."[20] Thereon, he listed the interest in the Suzuki as voluntarily surrendered,[21] as he did not have possession of the vehicle.[22] Silver State's internal records show it received notice of the plan, although it appeared confused by the plan, as it claimed it was listed as "surrendered," not that Richard would be "surrendering" his interest.[23]

4. On December 21, 2009, after the Court entered its order confirming Richard's plan, Silver State subsequently moved for relief from the automatic stay with respect to the Suzuki;[24] it re-urged its motion again in February 2010.[25] On March 16, 2010, the Court granted Silver State's re-urged motion, which permitted Silver State to "exercise all legal rights *with respect to its collateral*," but said nothing about Richard's *personal* responsibility for the debt.[26] On March 25, 2009, the Court entered an order approving a modified Chapter 13 plan, which again indicated that Richard would be "surrendering" his interest in the vehicle.[27] Silver State it subsequently repossessed the vehicle and auctioned it off on April 15, 2010.[28]

5. Thereafter, Richard completed his bankruptcy. The Chapter 13 Standing Trustee's Final Report lists his Silver State interest as "surrendered," and on March 30, 2014, Richard earned

---

[17] *Id.* at 63:22-64:24.
[18] *Id.* at 67:3-7.
[19] *Id.* at 95:23-96:7.
[20] Order Confirming the Debtors Plan # 5, BK Doc. 65, Oct. 29, 2009 ("Oct. 2009 Confirmed Plan"), at 5-6, **Exhibit 5.**
[21] Hogue Depo, 78:22-79:3; Oct. 2009 Confirmed Plan, at 5-6.
[22] *Id.* at 83:16-21.
[23] Workflow History, at 3 (11/17/2009 entry). Silver State appears to have caught its mistake later, as a 2/16/2010 entry in the "Workflow History" indicates that "per notes member is surrendering vehicle." *Id.*
[24] Motion for Relief from the Automatic Stay, BK Doc. 76, Dec. 21, 2009 ("First Silver State Motion"), **Exhibit 6.**
[25] Amended as to Date Motion for Relief from the Automatic Stay, BK Doc. 84, Feb. 5, 2010 ("Second Silver State Motion"), **Exhibit 7.**
[26] Order for Relief from the Automatic Stay, BK Doc. 98, Mar. 16, 2010 ("Stay Order") (emphasis added), **Exhibit 8.**
[27] Order Confirming the Debtors Plan # 7, BK Doc. 99, Mar. 25, 2009 ("Mar. 2010 Confirmed Plan"), **Exhibit 9.**
[28] Workflow History, at 2 (4/20/2010 entry).

his Chapter 13 bankruptcy discharge, which Silver State acknowledged.[29]

6.      Thereafter, Richard pulled his Experian credit report on April 28, 2015, in order to determine if his reporting was accurate or if anyone was using his credit information.[30]  On the credit report, he discovered that Silver State reported that his account reported a "status" of "included in bankruptcy," and under the "account history," that it had been "discharged Through BK Ch 7, 11, or 12 on Apr 30, 2010."[31]  Under the "payment history," Silver State reported a slew of post-petition late payments from June 2009 through February 2010: 30 days late in June, 60 days in July, 90 days in August, 120 days in September, 150 days in October, and 180 days late in every month from November 2009 through February 2010.[32]  Finally, in March 2010, Silver State reported that the collateral had been "voluntarily surrendered."[33]

7.      On July 17, 2015, Richard disputed his information with Experian.[34]  Thereon, Richard requested that certain information be corrected.  Specifically, Richard asked that the late payments following the filing of Richard's bankruptcy be removed, and if they were not removed, he requested that a 100-word statement be included on his account "of all the disputed information

---

[29] Discharge of Debtor after Completion of Chapter 13 Plan, BK Doc. 141, May 30, 2014 ("Discharge Order"), at 1, **Exhibit 11**; Defendant Silver State Schools Credit Union's Responses to Plaintiff's First Set of Requests for Admission, Sept. 15, 2016 ("RFA Responses"), at 9, **Exhibit 25**.

[30] Hogue Depo, 118:19-119:1; Dispute to Experian, comprised of: (1) July 17, 2015 Letter to Experian, RHOGUE0073-79 ("Letter"), Apr. 28, 2015 Experian Credit Report, No. 3348-0866-81, RHOGUE0080-105 ("Report"), Docket from U.S. Bankruptcy Court, No. 09-11367-btb, RHOGUE0106-127 ("Docket") and Driver's License for Richard Hogue, RHOGUE0128 ("License") (collectively, the "Dispute"), **Exhibit 12**.  Experian has called this document by various terms.  Amanda Hoover calls it a "Your Personal Credit Report."  *Hogue v. Allied Collection Service*, No. 16-cv-1620-JCM-VCF, ECF Dkt. 44, at ¶ 11 Declaration of Amanda Hoover (D. Nev. July 10, 2017) ("Hoover Declaration"), **Exhibit 26**.  Mary Methvin has called it a "consumer disclosure."  *Cardinali v. Plusfour, Inc.*, No. 16-cv-2046-JAD-NJK, ECF Dkt. 51-1, at ¶ 6 Declaration of Mary Methvin in Support of Experian's Motion for Summary Judgment in *Pappas v. U.S. Bank Home Loan Mortgage, N.A.*, No. 15-cv-8115 (N.D. Ill. Oct. 3, 2016) (D. Nev. Mar, 8, 2017) ("Methvin Declaration"), **Exhibit 27**.  Ana Simmons has commonly referred to reports like Mr. Hogue's as a "consumer disclosure initial" or "CDI."  Feb. 24, 2017 deposition of Anna Simmons as Experian's 30(b)(6) witness in *Travers v. State Collection Services, Inc. et al.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 93-21 (D. Nev. July 3, 2017) ("Travers Experian Depo"), at 46:15-47:16; 50:24-51:15, **Exhibit 23**.  Indeed, Ms. Simmons believed that a "consumer report" was a "CDI."  *Id.* at 48:22-50:18.  Ms. Simmons has in turn referred to a "consumer report" as "a report of credit information furnished by a CRA to a credit grantor, insurer, or employer for the purpose of evaluating a consumer's eligibility for credit to be used primarily for personal, family or household purposes, or for employment purposes." *Travers v. State Collection Service, Inc.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 89, at ¶ 7, Declaration of Anna Simmons in Support of Experian's Motion for Summary Judgment (D. Nev. July 3, 2017) ("Simmons Declaration"), **Exhibit 28**.

[31] Report at 7 of 24.

[32] *Id.*

[33] *Id.*

[34] Hogue Depo, 150:10-151:25; *see also* Dispute, at 1, 6.

contained in this letter regarding this account."[35]  Richard testified that he believed the "status" of his bankruptcy should report from his bankruptcy filing date.[36]  He also testified that he did not believe the "recent balance" should have been "May of 2014," as this was not his bankruptcy filing date.[37]

8.      After receiving notification of Richard's dispute, Experian forwarded the same to Silver State via an Automated Credit Dispute Verification ("ACDV").[38]  Experian also sent Silver State Mr. Hogue's dispute, Experian credit report, and identifying information, as demonstrated by a "Y" notation near the top of the ACDV.[39]  While Silver State was supposed to keep a copy of this additional correspondence, it had failed to do so in this case.[40]  However, Silver State testified that it had a copy of the consumer dispute Richard had sent via Experian,[41] and also admitted it had received notice to Richard's dispute in discovery.[42]  The ACDVs Silver State receives from CRAs do not always contain additional information in addition to the ACDV itself.[43]

9.      Experian sent its ACDV to Silver State through an online platform known as e-Oscar.[44]  An ACDV is the only way Silver State receives notification of consumer disputes from CRAs like Experian,[45] in part because an ACDV, as opposed to other notices, provides a noticed date.[46]  The ACDV "queue" in e-Oscar also requires different access credentials and security protocols than other "queues."[47]  When receiving an ACDV, Silver State receives a view of how the disputed trade line is being reported, as well as the information which the consumer wants

---

[35] *See* Dispute, at 6.
[36] Hogue Depo, 184:4-19; *see also* Dispute, at 6.
[37] Hogue Depo, 187:16-188:11; *see also* Dispute, at 6.
[38] Feb. 3, 2017 Deposition of Tracy Meyer as Silver State Schools Credit Union's 30(b)(6) witness ("Silver State Depo"), at 57:23-58:16; 169:12-170:10, **Exhibit 21**. *See also* August 3, 2016 ACDV Response from Silver State to Experian, SSSCU000099 ("ACDV Response"), **Exhibit 13**.
[39] Silver State Depo, 236:11-237:14; *see also* ACDV Response, at 1 (noting that a "Y" appears on "Document Viewed" portion of ACDV; Travers Experian Depo, at 162:21-165:8 (noting that a "Y" on an ACDV means that additional information has been attached by Experian to the ACDV it sends to data furnishers).  Silver State is an active party to the *Travers* case, appeared at the deposition in question, and had an opportunity to raise objections at this Experian deposition.  *See id.*; Fed. R. Civ. Proc. 32(a)(3); Fed. R. Evid. 801(d).
[40] Silver State Depo, at 237:2-18.
[41] *Id.* at 95:22-97:10; ACDV Response.
[42] RFA Responses, at 10.
[43] Silver State Depo, 47:12-18; 49:9-50:4.
[44] Silver State Depo, 25:5-12; 44:11-22
[45] *Id.* at 58:17-59:6.
[46] *Id.* at 64:6-19.  Silver State testified that it would not respond to notifications other than ACDVs, and thus its internal policies and procedures were designed to handle ACDVs that came over e-Oscar, not other notifications. *See id.* at 66:9-67:8.
[47] *Id.* at 65:15-25.

reviewed.[48]  Silver State would also receive a copy of the dispute letter and additional information, if the CRA chose to send it on (as Experian had done here).[49]  Once Silver State completed its investigation of the consumer's account, it would send back an ACDV response to the CRA who originally sent the ACDV in question.[50]  While Silver State's policy is to archive a copy of an ACDV response just prior to its submission back to the CRA through e-Oscar, but in this case Silver State again failed to keep a record of Richard's draft ACDV response.[51]

10.     To respond to credit disputes, Silver State relies on a nine-page internal document called a "Lending Manual."[52]  Silver State also refers to an industry-wide resource known as the Credit Reporting Resource Guide ("CRRG").[53]  Along with providing guidance regarding proper reporting in many scenarios, the CCRG contains a list of industry-specific codes, known as the "Metro 2,"[54] which Silver State uses to respond to ACDV responses.[55]

11.     However, Silver State could not establish the evidentiary foundation of any of its claimed policies and procedures.  As to the CRRG, Silver State testified that it had destroyed the applicable copy of the CRRG prior to the deposition and no longer had a copy of it in its obtainable records.[56]  As to its use of e-Oscar and relationship with Experian, the CRRG's "user obligations" require that Silver State "agree to assume all responsibility concerning your use of the CRRG, including meeting any requirements or obligations of your contracts with third parties."[57]  In other

---

[48] *Id.* at 45:21-47:18.

[49] *Id.* at 49:9-23.

[50] *Id.* at 73:6-12.

[51] *Id.* at 91:18-92:25.  Silver State also archives AUDs, and none were sent in this case.  *Id.* at 93:7-15.  In contrast, Silver State does not archive DR Notifications.  *Id.* at 93:2-6.  The parties obtained an actual ACDV Response from Experian.  *See* ACDV Response.

[52] *Id.* at 72:13-20; SSSCU Lending Manual, May 8, 2015, SSSCU000075-83 ("Lending Manual") (sealed), **Exhibit 18**.

[53] Silver State Depo, 33:12-21; *see also* 2013 Consumer Reporting Resource Guide, EXP_RHOGUE_000946-001199 ("CRRG") (sealed), **Exhibit 19**.

[54] Silver State Depo, 35:8-36:7.

[55] *Id.* at 126:9-12.  Silver Sate testified that she believed Experian uses the Metro 2 format, and Silver State believed, based on observations of Experian credit reporting, that they followed the CRRG reporting guidelines generally, and was not aware of any instance where Experian did not rely on either the Metro 2 format or the CRRG guidelines.  *Id.* at 134:6-14; 135:7-15.  Silver State's witness also testified that she believed Experian had helped create the CRRG.  *Id.* at 136:19-22.

[56] *Id.* at 39:22-41:12.  While Silver State indicated that it could "try" to find a copy of the applicable CDIA, it never confirmed whether it had actually done so.  *See id.* at 40:13-41:12.

[57] 2013 CRRG, at pg. i.

related cases, Silver State claims to have a written contract with Experian;[58] but the best evidence Silver State could produce was a three-page, sixteen-year-old "Subscriber Service Agreement," which Experian had not signed.[59]  The agreement purported to require Silver State to furnish accurate data to Experian,[60] although Experian would not guarantee that the data in its own files, or any information it provided to Silver State, would be accurate.[61]

12.    In other cases, Silver State has acknowledged that it only receives consumer dispute from CRAs through e-Oscar.[62]  Silver State's May 2015 internal credit-dispute policy[63] provides e-Oscar screen shots "[t]o show a step by step how to respond to a dispute on the e-Oscar system."[64]  However, Silver State could not locate a copy of its written contract with e-Oscar,[65] and in fact could only speculate whether any contract had ever been entered in to; thus, its 30(b)(6) witness could not ultimately testify whether there were any restrictions on its use of e-Oscar at all. [66]  The best she could say was that if Silver State had any agreement with e-Oscar, the agreement would have been entered into in 2003.[67]  Silver State was unable to confirm it could refer back to a copy of a written agreement with e-Oscar when it designed its credit-dispute policies and procedures in 2015.[68]

13.    When evaluating a Chapter 13 dispute like Richard's, Silver State would look at his bankruptcy petition, the relevant schedules, the docket report, and the discharge, as well as relevant bankruptcy documents.[69]  Silver State acknowledged that Richard's October 29, 2009 plan of reorganization included an entry that Richard was "surrendering interest" in Daniel's Suzuki

---

[58] March 6, 2017 Deposition of Tracy Meyer as Silver State Schools Credit Union's 30(b)(6) witness in *Travers v. State Collection Services, Inc. et al.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 93-26 (D. Nev. July 3, 2017) ("Travers Silver State Depo"), at 53:6-14, **Exhibit 24**.  *See* Fed. R. Civ. Proc. 32(a)(3); Fed. R. Evid. 801(d).  Silver State claims to have a contractual relationship with each of the four CRAs it reports data to (Equifax, Trans Union, Experian, and Innovis).  *See id.*

[59]  Travers Silver State Depo, 53:15-67:19;  *see also* Nov. 21, 2000 Subscriber Service Agreement, SSSCU000133-135 ("Subscriber Agreement") (sealed), **Exhibit 20**.

[60] *Id.* at 61:17-62:12; *See* Subscriber Agreement.

[61] *Id.* at 60:15-61:15; 66:23-67:15; *See* Subscriber Agreement.

[62] *Id.* at 52:2-7.

[63] *Id.* at 46:3-6.

[64] *Id.* at 47:15-21.

[65] *Id.* at 48:15-51:14.  Ms. Meyer noted that in her personal experience, an entity named "OLDE" was the entity whom data furnishers would agree to terms and conditions with in order to access the e-Oscar system.  *Id.* at 48:49:18.

[66] *Id.* at 44:3-51:14.

[67] *Id.* at 51:15-20.

[68] *Id.* at 46:7-48:1.

[69] Silver State Depo, 144:7-145:17.  Silver State organizes accounts by a generic "member number," so when it receives a dispute containing only a partial number, it investigates all of the members' accounts.  *Id.* at 97:11-99:1.

Verona.[70]   Silver State acknowledged that it filed an amended motion for relief of the automatic stay months after the entry of the plan of reorganization, on February 5, 2010.[71]   Silver State acknowledged that the Bankruptcy Court had entered an order granting relief from the automatic stay on March 16, 2010.[72]   Silver State claimed the order permitted it to exercise lien enforcement, but not collections,[73] and that the Trustee's Final Report showed that Richard's interest had been surrendered.[74]

14.   Silver State submitted an ACDV response to Experian on August 3, 2016.[75] Thereon, they reported a response code of "02 – modify account information as indicated."[76]   In their response, they reported an "original delinquency date" of January 2009, the date of Richard's Chapter 13 petition, but left the subsequent late payments from June 2009 through February 2009, as well as the "voluntary surrender" notation, in place without changing them.[77]   Paradoxically, Silver State took it upon itself to report a "closed date" of April 2010 – one month *after* the interest was voluntarily surrendered – and then placed a "balance date" more than five years after, on 5/30/2014 – the date of the bankruptcy discharge.[78]   Silver State also reported Richard's account with a status of "L," which meant "charge off."[79]   Silver State acknowledged that it could report a "charge off" only once, and that derogatory reporting would continue for seven years after the first "charge off" entry.[80]

15.   On August 20, 2015, Richard received his reinvestigation results from Experian, which indicated that a pair of Silver State accounts had been "updated" (even though he'd only disputed one).[81]   For the Silver State account Richard specified in his Dispute letter, Silver State

---

[70] *Id.* at 154:1-156:19.
[71] *Id.* at 156:20-157:10.
[72] *Id.* at 157:21-157.
[73] *Id.* at 158:22-159-22.
[74] *Id.* at 168:11-169:3.
[75] *Id.* at 169:12-170:14; ACDV Response.
[76] ACDV Response.
[77] *Id.*
[78] *Id.*
[79] Silver State Depo, 194:6-21.
[80] *Id.* at 194:16-197:2.
[81] Hogue Depo, 178:4-179:2; August 20, 2015 Reinvestigation from Experian, Report No. 3488-0202-41, ("Reinvestigation"), at 2 of 20, **Exhibit 14**.  The Reinvestigation also contained an "update" to another Silver State account Richard held but which he had not disputed; there is no evidence of this "update" elsewhere on the Reinvestigation.  *See id.*  The Reinvestigation has been produced in more legible, color format; a black-and-white copy of the partial reinvestigation, which shows the disputed Silver State reporting, is appended to it.  Again, Experian's witnesses disagree about the terminology of this document.  Ms. Hoover refers to it as a "Dispute Results Report," Hoover Declaration at ¶ 27.  Ms. Simmons has referred to it as a "consumer disclosure final," or CDF." Experian Travers Depo, at 46:15-47:16.

account had not included a statement of dispute as he'd requested.[82]  On the account, Silver State rereported the post-petition bankruptcy late payments from June 2009 through February 2010, with the account being "voluntarily surrendered" in March 2010.[83]  This occurred despite the fact that the "account history" section of the credit report also indicated, "Debt *included* in Chapter 13 Bankruptcy on May 30, 2014," without an indication as to whether that was the discharge date or the petition date.  Silver State's witness testified that she believed "included" meant "part of," but that "discharged" meant "to do away with."[84]  There was no indication whether the May 30, 2014 date pertained to the date of Richard's petition, or his discharge – and thus no indication how long the account would continue reporting negatively on Richard's account.[85]

16.     Paradoxically, Silver State testified that it had updated the "balance date" to May 30, 2014, and that that date represented "the last time that there was a change in the balance and that there was no reporting of the balance after that date."[86]  Silver State's witness also testified that she had used the May 30, 2014 date because "I wanted to ensure that this stated that this was a zero balance as of that date, May 30, 2014," and to ensure the account balance would be zero as of a certain time – which in fact was reported.[87]  Yet, in the "account history" section of Richard's reinvestigation, Silver State now reported "account balances" of $11,834 *every month* from August 2013 through May 2015 – despite the fact that the account had been "closed" in April 2010, and Richard's bankruptcy had been discharged on May 30, 2014.[88]  Silver State's internal records showed a "balance" still owing on the account for many of these post-surrender, post-discharge months, but the amount in their records didn't even match the "balances" listed on the "account history" it had reported to Experian.[89]  Silver State's 30(b)(6) witness acknowledged the discrepancy, but could not explain it.[90]  Silver State also acknowledged that its internal records show the presence of ten entries which state, "send checking demand letter" – all of which were dated after Richard's

---

[82] Reinvestigation, at 6.
[83] Silver State Depo, 206:8-207:6; ACDV Response; Reinvestigation, at 6 of 20.
[84] Silver State Depo, 215:8-17; Reinvestigation, at 6 of 20.
[85] *See* Reinvestigation, at 6.
[86] Silver State Depo, 204:10-205:4.
[87] Silver State Depo, 212:1-11; Reinvestigation, at 6 of 20.
[88] Silver State Depo, 241:3-16; Reinvestigation, at 6 of 20.
[89] Silver State Depo, 241:17-244:5; Reinvestigation, at 6 of 20; Workflow History, at 1-2.
[90] Silver State Depo, 241:17-244:5; Reinvestigation, at 6 of 20; Workflow History, at 1-2.

bankruptcy discharge.[91]  Again, Silver State's witness could not explain what these letters were, what content they contained, or whether they'd even been sent out.[92]

17.    Silver State's 30(b)(6) witness also acknowledged that Richard's dispute asked for the inclusion of a 100-word statement in the event the account was not deleted, but indicated that it was not Silver State's policy to provide such information on a dispute it obtained from a credit reporting agency, claiming that they could not add such a dispute because there was no provision for one in an ACDV response.[93]

18.    On July 11, 2016, Richard sued Silver State.[94]  In response, Silver State pulled a particular Experian consumer report, called a "bullseye," in order to "to make sure that the dispute [Silver State] answered was really what they reported, because [Silver State] was surprised that we were getting served with a complaint after answering the dispute."[95]  Silver State also emailed Experian, stating confusion over why the account no longer reported, claiming it reported a charge-off of "L" and did not want this negative account to be removed from Richard's credit report.[96]

19.    Silver State also testified that it does not send out an Automated Universal Dataform ("AUD") when completing the ACDV process.[97]  Silver State's witness did not indicate whether its ACDV response to Experian would be sent to other credit reporting agencies, if Silver State modified the information on a consumer's account (as it had done here).[98]  In fact, Silver State had no idea what changes, if any, Experian was authorized to make without notifying Silver State first.[99]

20.    However, in this case the evidence suggests that Silver State did not notify all of the other CRAs to whom it reports data of its report of reinvestigation.  For example, while the Silver

---

[91] Silver State Depo, 244:19-249:3; Workflow History, at 1-2.
[92] Silver State Depo, 245:4-249:21.
[93] Id. at 107:6-113:18.
[94] ECF Dkt. 1.
[95] Silver State Depo, 216:25-217:3; July 21, 2016 Experian Bullseye, SSSCU000071 ("Bullseye"), July 21, 2016 Equifax Automated Data View Report, SSSCU000072 ("Data View Report"), and Emails from Tracy Meyer to Experian, SSSCU000073-74 ("Emails") (collectively, "Silver State Post-Investigation Inquiry"), **Exhibit 15**. Silver State agreed that a "credit report" could be "if an account identified a consumer by name and then had the information related to that consumer about payment history . . . account balance opened, date of last payment."  Silver State Depo, 122:13-21.  Silver State also testified that Silver State had received an ACDV from a credit bureau after the filing of a complaint on at least one occasion.  Silver State Depo, 221:13-17.
[96] Silver State Depo, 216:25-217:3; Silver State Post-Investigation Inquiry.
[97] Silver State Depo, at 74:3-6.
[98] See id. at 73:3-74:24 ("[W]e sent it through e-Oscar.  E-Oscar sends it back to the originating CRA, right.").
[99] Id. at  61:23-62:8.

State account thankfully disappeared from Richard's October 16, 2016 Experian credit report,[100] on Richard's January 16, 2017 Trans Union credit report, Richard's account was still being reported as "closed" with a "high balance" of $13,023, and a "last payment made" on March 10, 2011.[101]  Silver State's 30(b)(6) witness had no explanation for why Trans Union had reported the Silver State account in January 2017, although she acknowledged that the account would report for seven years from March 2010.[102]  According to the Trans Union Report, the account had been last updated in on July 31, 2015.[103]  This was several days before Silver State responded to Experian's dispute notice, as Silver State's ACDV response was dated August 3, 2015.[104]

21.     Silver State has testified in other cases that the results of its investigation are sent, if at all, to other CRAs when it send the ACDV response – but not before,[105] and considers its investigation over once it submitted its ACDV response.[106]  This, it is impossible that Silver State transmitted its Experian reinvestigation to Trans Union, as 15 U.S.C. § 1681s-2(b)(1)(D) required.

22.     Moreover, and while not explicitly made part of this motion for partial summary judgment, Richard has suffered damages as a consequence of this negative reporting.  A willful FCRA violation results in an award of statutory damages and requires no showing of actual damages.[107]  For a negligent FCRA violation, Richard can show actual damages.

23.     Richard testified that he has suffered out-of-pocket expenses.[108]  Richard also testified that he has suffered exacerbation of prior medical conditions, and stress.[109]  Richard was also dissuaded or unable to apply for credit, and couldn't put his name on a home he and his wife had purchased, due to the reporting on his bankruptcy.[110]  For example, Richard believed that when he and his wife were shopping for a mortgage, they did not receive as competitive of an interest rate

---

[100]  Hogue Depo, 210:21-211:23; October 17, 2016 Experian Credit Report, No. 2035-2841-62, EXP/RHogue000001-24 ("Oct. 2016 Experian Report"), **Exhibit 16**.

[101]  Hogue Depo, 302:2-303:5 (cross-examination); Silver State Depo, 264:8-267:24; January 16, 2017 Trans Union Credit Report, File No. 332568055, HOGUE00221-0240 ("Jan. 2017 Trans Union Report"), at 9 of 20, **Exhibit 17**.

[102]  Silver State Depo, 264:8-267:24; Jan. 2017 Trans Union Report, at 9.

[103]  Silver State Depo, 264:8-267:24; Jan. 2017 Trans Union Report, at 9.

[104]  *Compare* Jan. 2017 Trans Union Report, at 9, *with* ACDV Response.

[105]  Silver State Depo, 73:3-19.

[106]  Travers Silver State Depo, at 82:19-24.

[107]  15 U.S.C. § 1681n.

[108]  Hogue Depo, 246:11-19.

[109]  *Id.* at 246:21-247:17.

[110]  *Id.* at 31:23-32:2.

because he could not add his income to the loan application, which he would otherwise have liked to have signed.[111]   Ultimately, Richard was unable to place his name on the mortgage, with Richard's rejection being premised on the fact that a bankruptcy was still on his credit report.[112]   This caused Richard to be upset, as he could not contribute to a major family purchase and could not tell his son that he owned a home.[113]   The fact that Richard can't contribute has also led his wife to pay higher interest rates, and meant that the house was in his wife's name only.[114]

24.     Richard also feared the consequences of having the negative entries on his credit report, which may have a direct impact on his future employment.   Richard currently has a job working for the federal government, which requires a security clearance and a federal background check every five years.[115]   The background check is a harrowing experience in which FBI agents pour over his background information, including his credit report.[116]   At his last background check in 2012, Richard recalls federal agents paying specific attention to derogatory entries.   Depending on when his Silver State account was first "derogatory," the information either would or wouldn't appear on his credit report during his 2017 background check.   If the seven-year derogatory clock begins running from the date of Richard's bankruptcy petition, or even the date he surrendered the collateral to Silver State, it will be "aged off" his credit report by the time FBI agents review it again. If the clock runs from the date of Richard's bankruptcy discharge in 2014, the entry would remain until 2021, and might subject Richard to additional, undeserved employment-related scrutiny.[117]

25.     Richard believed that his bankruptcy, and any accounts included therein, should have aged off of his credit report seven years from the date of his petition, or in January 2016.[118]   Silver State acknowledged that a negative entry would report for seven years after the date it was originally reported.[119]   Silver State has admitted elsewhere that having an account included in bankruptcy could adversely affect credit decisions.[120]

---

[111] *Id.* at 314:11-23 (cross examination).
[112] *Id.* at 316:17-319:12.
[113] *Id.* at 316:17-319:12.
[114] *Id.* at 313:17-315:14; 316:16-319:12 (cross examination).
[115] *Id.* at 34:20-21 (direct examination); 256:20-259:23 (cross examination).
[116] *Id.* at 256:20- 258:11 (cross examination).
[117] *Id.* at 258:17-259:6.
[118] *Id.* at 259:11-23 (cross examination).
[119] Silver State Depo, at 202:12-14.
[120] Travers Silver State Depo, 147:6-148:21.

## STATEMENT OF DISPUTED MATERIAL FACTS[121]

1. Plaintiff does not state that the reporting of these past due dates was factually inaccurate.[122]

2. He claims that the any past due dates were legally inaccurate because of the discharge.[123]

3. Plaintiff has not alleged or provided any evidence that the ACDV was inaccurate.[124]

## STANDARD OF REVIEW

"Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[125] When the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden by: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[126] If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[127] If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists.[128] To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. On summary judgment, a court's function is not to weigh evidence and determine the truth but to determine whether a genuine issue for trial exists.[129] The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."[130]

## DISCUSSION

The FCRA imposes obligations on persons or entities, such as creditors, that "furnish" information to credit reporting agencies.[131] There are two components to a furnisher's obligations

---

[121] Citation to the statements in Silver State's motion is complicated somewhat by Silver State's failure to place these statements in numbered paragraphs.

[122] Motion, at 5. Statement is misleading as Richard's dispute letter requested that the payments in question be removed; Richard is not required to use the "magic word" "inaccurate." *See* SUMF, at ¶ 7.

[123] Motion, at 5. Statement is misleading as Richard's dispute letter requested that the payments in question be removed; Richard is not required to use the "magic word" "inaccurate." *See* SUMF, at ¶ 7.

[124] Motion, at 6. Statement unsupported by any evidence. However, *see, e.g.*, SUMF at ¶¶ 10-11, 14.

[125] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).

[126] *See Celotex*, 477 U.S. at 323–24.

[127] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

[128] *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[129] *See Anderson*, 477 U.S. at 249.

[130] *Id.* at 255.

[131] *See* 15 U.S.C. § 1681s-2.

under Section 1681s-2 of the FCRA.  Subsection (a) sets forth a furnisher's duty to report "accurate information" to the credit reporting agencies.[132]  Subsection (b) sets forth a furnisher's duty to conduct an investigation in response to notice of dispute from a CRA.[133]  Although furnishers have obligations under both subsections, only subsection (b) contains a private right of action.[134]

### 1. Silver State's Motion for Summary Judgment can be denied with recourse to only a few undisputed facts.

#### A. The undisputed material facts show that Richard satisfies all elements of his negligent and willful 15 U.S.C. § 1681s-2(b) claims.

"To state a claim against a furnisher under Section 1681s-2(b), a plaintiff must allege that: (1) he found an inaccuracy in [her] credit report; (2) he notified a credit reporting agency; (3) the credit reporting agency notified the furnisher of the information about the dispute; and (4) the furnisher failed to investigate the inaccuracies or otherwise failed to comply with the requirements of 15 U.S.C. § 1681s-2(b)(1)(A)-(E)."[135]  When a furnisher receives notice of a consumer dispute, it must conduct a reasonable investigation into whether the disputed information is inaccurate, correct any items found to be incomplete or inaccurate, and report any corrections to all consumer reporting agencies to which it originally furnished the information.[136]  Sections 1681n and 1681o provide a right of action applicable to Section 1681s-2(b)'s requirement for a furnisher's investigation.[137]  For a willful violation, because the FCRA provides for money damages *in lieu* of actual damages, a plaintiff doesn't need to prove damages and causation.  Thus, Richard can prove either (i) damages and causation for negligence, or (ii) that the CRA's failure to reinvestigate reasonably was willful.[138]

Here, the facts establish each element: (1) Plaintiff's April 28, 2015 consumer report contained inaccuracies on his Silver State account,[139] (2) on July 17, 2015, Richard sent his Dispute to Experian, pointing out inaccuracies in Silver State's reporting;[140] (3) Experian forwarded on the

---

[132] 15 U.S.C. § 1681s-2(a)(1)-(9).
[133] 15 U.S.C. § 1681s-2(b)(b)(1)-(2).
[134] *See Gorman v. Wolpoff & Abramson*, 584 F.3d 1147, 1162 (9th Cir. 2009).
[135] *Riekki v. Bank of America*, No. 2:15-cv-02312-GMN-VCF, 2016 WL 8737439, at *2 (D. Nev. June 10, 2016); *see also Gorman*, 584 F.3d at 1154 (9th Cir. 2009); *Polvorosa*, 2017 WL 29331, at *4; *Pauli*, 2017 WL 2381275, at *2.
[136] *See* 15 U.S.C § 1681s-2(b)(1)(A)-(E).
[137] *Gorman*, 584 F.3d at 1154 (citing 15 U.S.C. §§ 1681s–2(c) and (d)).
[138] *Saenz v. Trans Union*, 621 F. Supp. 2d 1074, 1082 (D. Or. 2007); *In re Ocwen Loan Servicing LLC Litigation*, --- F. Supp. 3d ----, No. 16-cv-200-MMD-WGC, 2017 WL 1289826, at *5 (D. Nev. Mar. 3, 2017); *Smith v. One Nevada Credit Union*, No. 16-cv-2156-GMN-NJK, 2017 WL 2803169 at *3-5 (D. Nev. June 27, 2017).
[139] Statement of Undisputed Material Facts, *supra*, ("SUMF"), at ¶ 6.
[140] *Id.* at ¶ 7.

dispute to Silver State,[141] and (4) Silver State failed to reasonably investigate the inaccuracies and comply with the requirements of the FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)-(E), by rereporting inaccurate information, adding more inaccurate information, and failing to send the results of his investigation to other CRAs.[142]   Richard also incurred statutory damages, because Silver State's reporting was reckless and willful; in that scenario, he need not prove actual damages.[143]   But to the degree relevant, Richard's out-of-pocket expenses were caused by Silver State's negligently inaccurate reporting and rereporting.[144]   Establishing the elements of either a negligent or willful FCRA violation also entitles the plaintiff to an award of reasonable attorney's fees and costs.[145]

**B. Silver State's motion can be denied based on several undisputed facts and a recognition that Silver State did not properly move for summary judgment on all aspects of Richard's Section 1681s-2(b) claim.**

Setting every other fact aside, it's undisputed that Silver State placed an "L" in the "Account Status/Rating" box of its ACDV response to Experian, and an "account balance" of 5/30/2014. Silver State acknowledged that a "charge off" would report for seven years from the date of the first charge-off entry – in this case, until May 30, 2014.[146]   This had the consequence of reporting Richard's account as "$0 as of May 2014" while *simultaneously* reporting post-discharge account balances of $11,834 *every month* from June 2014 through May 2015 on Richard's reinvestigation. One of these items of information *must* be inaccurate.   It's also undisputed that Silver State failed to move on any portion of Richard's claim that Silver State failed to report the results of its reinvestigation to Trans Union, in violation of 15 U.S.C. § 1681s-2(b)(1)(D).[147]

Further, because Silver State never specifically or properly moved for summary judgment on (1) any portion of Richard's claim for a willful FCRA violation, or (2) Richard's claim for a negligent FCRA violation as it relates to out-of-pocket expenses, Richard's Section 1681s-2(b) claim must reach the jury to demonstrate both negligent and willful violations.   Thus, the Court can take Ockham's Razor to the parties' voluminous briefing, and deny Silver State's motion for summary judgment on these grounds alone.   The rest of Richard's motion responds to Silver State's arguments.

---

[141] *Id.* at ¶ 8.
[142] *Id.* at ¶¶ 14,-17, 19-21.
[143] *Id.* at ¶¶ 10-12, 18-22.
[144] *Id.* at ¶¶ 22-25.
[145] ECF Dkt. 1; 15 U.S.C. §§ 1681n, 1681o.
[146] *Id.* at ¶ 14.
[147] *Id.* at ¶¶ 19-22.

1

2

2. __Silver State's arguments in support of its motion do not entitle it to summary judgment.__

   A. **Silver State's claim that it has no "duty" to investigate the complaint is contrary to both the plain language of the FCRA and guidance from this Court.**

Silver State's lead argument is that it had no investigatory duties under 15 U.S.C. § 1681s-2(b) because the "Your Personal Credit Report" (which Experian's 30(b)(6) representative commonly defines as a "consumer disclosure" or "CDI"), isn't a "consumer report" under Section 1681a(d) which is "used to make credit decisions."[148]   Silver State begins its analysis with a selective misreading of Section 1681a(d),[149] and then fails to properly read section 1681s-2(b) in context. "Statutory construction, however, is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because . . . one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."[150]

Silver State suggests that its duties to investigate a consumer dispute under section 1681s-2(b) be triggered only when (1) a consumer disputes information published (2) in a consumer report, and (3) that consumer report was disclosed to a third-party.[151]   The fatal flaw in Silver State's analysis is found in section 1681s-2(b)(1)'s predicate language to clause (A).  It provides that a data furnisher's duties to investigate are triggered after receiving notice pursuant to section 1681i(a)(2) that a consumer is disputing "the completeness or accuracy of *any information provided by a person to a [CRA]. . . .*"[152]   The passage in *Wantz* that Silver State cites for its erroneous proposition is

---

[148] Motion, at 9.   *Compare* SUMF, at ¶ 7, Travers Experian Depo, 46:15-47:16; 50:24-51:15, *with* Hoover Declaration, at ¶ 11.

[149] The plain language of Section 1681a(d) does not support Silver State's contentions.  Silver State cites an excerpt from subsection 1681a(d)(A), while omitting subsections 1681a(d)(B) and (C).  The full text of these subsections reads as follows:

   **(d)CONSUMER REPORT.—**

      **(1)IN GENERAL.—**The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—

      **(A)** credit or insurance to be used primarily for personal, family, or household purposes;

      **(B) employment purposes; or**

      **(C) any other purpose authorized under section 1681b of this title.**

15 U.S.C. § 1681a(d) (emphasis added); *see also Reynolds v. Hartford Financial Services Group, Inc.*, 435 F.3d 1081, 1094 (9th Cir. 2006), *rev'd on other grounds*, 551 U.S. 47 (2007) (noting that Section 1681a(d) is "broad."). The definition is subject to a number of exceptions in subsection 1681a(d)(2), which are not relevant here.

[150] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

[151] ECF Dkt. 43 at 10:7-12 (citing 15 U.S.C. § 1681s-2(b)(1)(A); *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004), *as amended* (Nov. 16, 2004) *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007))

[152] 15 U.S.C. § 1681s-2(b)(1)(A).

readily distinguishable. There, the *Wantz* court was considering only the narrow question of whether a report meets FRCA's definition of a consumer report.[153] The court did not consider whether a furnisher violated its investigation duties under subsection 1681s-2(b)(1). Accordingly, *Wantz* never reached the question of whether a consumer must first dispute information on a consumer report provided to third parties is a predicate to adequate notice under subsection 1681s-2(b)(1). Nor could it: *there is no such requirement.*

The proper analysis, which *Polvorosa* and *Pauli* address, requires a reference to the whole statute. Only a reading of subsection 1681s-2(b)(1) together with its look-through to notice under subsection 1681i(a)(2) produces a substantive effect that is compatible with the rest of the law.[154] Another canon of construction recognizes that "[a] general statutory rule usually does not govern unless there is no more specific rule."[155] Here, Congress did not use the more specific and defined term "consumer report" *anywhere* within subsection 1681s-2(b)(1)'s provisions. When Congress intends to use "consumer report" to inform parties' duties, it does so specifically.[156] Here, there is no more specific rule providing that Silver State's investigation duties were only triggered if Plaintiff disputed information published in a consumer report that was disclosed to a third-party. Accordingly, the court may easily deny Silver State's Motion on this basis.

**B.  Silver State's claim that the "Your Personal Credit Report" (CDI) and the "Dispute Results Report (CDF) are not "consumer reports" is also legally flawed.**

Based on its flawed statutory interpretation, premise, Silver State contends that it had no "duty" to investigate Richard's dispute under 15 U.S.C. § 1681s-2(b) because neither the credit report Richard attached to his dispute, nor the reinvestigation Experian sent, were "consumer reports." Silver State's positions are also legally unsupportable.

Again, as this Court has remarked in *Polvorosa*, *Pauli*, and elsewhere, the FCRA provides a "filtering mechanism" in which a private right of action against a data furnisher is premised on proper notice from a CRA pursuant to 15 U.S.C. § 1681i(a)(2).[157] 15 U.S.C. § 1681i(a) requires a consumer reporting agency to conduct a reinvestigation "if the completeness of accuracy of *any item*

---

[153] *Wantz,* 386 F.3d at 834.
[154] *E.g.*, *Polvorosa*, 2017 WL 23991, at *4; *Pauli*, 2017 WL 2381275, at *3.
[155] *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989).
[156] *E.g.*, 15 U.S.C. § 1681i(a)(6)(B)(ii) requiring that a CRA report its results of reinvestigation in the form of a "consumer report"; 15 U.S.C. § 1681b (providing the permissible purposes of a "consumer reports".
[157] *See Polvorosa*, 2017 WL 23991, at *4; *Pauli*, 2017 WL 2381275, at *3.

*of information* contained in a *consumer's file* at a consumer reporting agency is disputed by the consumer."[158]   The word "file" is a defined term in the FCRA; "when used in connection with information on any consumer, means all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."[159]   Thus, the scope of disputable information under 1681i is even broader than the broad definition of "consumer report."

After a dispute is submitted to a CRA under 1681i, that CRA must "provide notification of the dispute to any person *who provided any item of information in dispute*."[160]   Again, the focus is not on information in a "consumer report," but rather any "item of information."  15 U.S.C. 1681s-2(b) reflects this, and imposes liability on a data furnisher "After receiving noticed pursuant to section 1681i(a)(2) . . . of a dispute with regard to the completeness or accuracy *of any information provided by a person to a consumer reporting agency*," the person shall conduct, *inter alia*, "an investigation with respect to the disputed information."[161]   The furnisher must then:

(A) conduct an investigation with respect to the disputed information;
(B) *review all relevant information provided by the consumer reporting agency pursuant to section 1681i (a)(2) of this title*;
(C) report the results of the investigation to the consumer reporting agency;
(D) if the investigation finds that the information is incomplete or inaccurate, report those results *to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis*; and
(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
(i) modify that item of information;
(ii) delete that item of information; or
(iii) permanently block the reporting of that item of information.

The statutory notification scheme has nothing to do with whether a plaintiff's notification is premised on a "consumer report," a personal credit report, or a hunch.  All a consumer must do is dispute the information with a CRA, and provide enough information for the CRA to determine that the dispute is not frivolous under 15 U.S.C. 1681i(a)(3).  As this Court stated in *Polvorosa*, "The

---

[158] 15 U.S.C. § 1681i(a)(1)(A) (emphasis added).
[159] *Id.* at § 1681a(g).
[160] *Id.* at § 1681i(a)(2)(A); *see id.* at § 1681i(a)(2)(B) (requiring a CRA to provide "all relevant information" to the furnisher).
[161] *Id.* at § 1681s-2(b).

duty imposed on furnishers of information is triggered on notice of dispute," and furnisher liability "is limited in that an individual consumer cannot state a FCRA unless the furnisher receives notice of the disputed information from the CRA and fails to comply with its duties."[162]   Silver State's new legal position is so flawed, not even their 30(b)(6) witness agreed with it – admitting at the deposition that they receive numerous disputes which contain nothing other than the ACDV itself.[163]   In this case, it's undisputed that Silver State received both an ACDV and Richard's credit report from Experian.  Silver State had a duty to investigate the information for accuracy, and is liable for any breach of 15 U.S.C. 1681s-2(b) arising from it.

Silver State's arguments regarding why its 1681s-2(b) "duty" to *investigate* was not triggered based the document *Experian* sent Richard *after Experian*'s own Section 1681i *reinvestigation* was complete is even more fundamentally flawed.  First, the "Dispute Results Report" (which Experian's 30(b)(6) witnesses characterize as a CDF) must be a "consumer report" because Section 1681i *requires* the CRA to send "a *consumer report* that is based upon the consumer's file as that file is revised as a result of the reinvestigation".[164]   Indeed, if Silver State is correct that Experian doesn't in fact submit a "consumer report" on reinvestigation – and to the degree it can point to an Experian's declaration to conclusively prove that fact – then Experian has *admitted* that it is engaging in a widespread and catastrophic breach of the FCRA *for all of the consumer reports it issues nationwide*.

Experian's failure to send its section 1681i report of its reinvestigation as a "consumer report" does not immunize Silver State from liability, because the form of the document Experian may send Richard *after* the reinvestigation is completed has nothing to do with the Silver State's prior section 1681s-2(b) duties to *investigate* the dispute once received, or to send the results of that investigation to all other consumer reporting agencies.  Silver State undisputedly failed to follow fulfill either duty here.

**C. Silver State conflates the disjunctive test of inaccuracy under controlling Ninth Circuit precedent.**

Silver State next contends that the information *must* have been seen by a future credit decision-maker to establish liability.  There is no such requirement under either the FCRA or controlling Ninth Circuit precedent interpreting the FCRA.  As the controlling precedent of *Carvalho*

---

[162] *Polvorosa*, 2017 WL 29331, at *4.
[163] *See, e.g.*, SUMF at ¶ 8; Silver State Depo, 47:12-18; 49:9-50-12.
[164] 15 U.S.C. § 1681i(a)(6)(B)(ii).

and *Gorman* point out, "[An item in a consumer's file can be "'incomplete or inaccurate' . . . 'because it is patently incorrect. . . .'"[165] "[I]nformation that is inaccurate 'on its face,' is 'patently incorrect.'"[166] Thus, "representations that Plaintiff still owed a debt and its implication that the debt might still be collectible following the bankruptcy discharge [are] inaccurate."[167]   Additionally, *Gorman* provides that under the FCRA, reported information can *alternatively* be inaccurate because it is materially misleading – i.e., is a "statement is concerned with omissions to credit entries that in context create misperceptions about otherwise factually accurate data.[168] "Materially misleading" means that information is misleading "in such a way and to such an extent that it can be expected to adversely affect credit decisions."[169] "[I]nformation that is open to an interpretation that is directly contradictory to the true information is sufficiently misleading to qualify as inaccurate."[170]

Silver State appears to have misread *Gorman*, which sets forth a *disjunctive* requirement that information must be *either* patently inaccurate *or* materially misleading – and it is only the latter on which the influence on a future credit decision-maker is even hypothetically relevant.  Here, Silver State reported a $0 balance on the account "as of May 2014" while also reporting a balance of $11,834 in *every month* from June 2015 through May 2015.  Setting everything else aside, one of these items of information cannot possibly be correct, and thus was patently inaccurate.  Even assuming *arguendo* that the information isn't patently inaccurate, it is clearly "open to interpretation" in a manner directly contradictory to the true information – i.e., that Richard's continued liability for payment on the account, even after Silver State reported a $0 balance on the account.

**D. Even if the Court adopts Silver State's misreading of controlling Ninth Circuit precedent, the evidence Silver State advances to support the proposition that the information would not appear in a consumer report is contradicted by Experian itself, and Silver State already has knowledge of that contradiction.**

To support the proposition that the "account history" section of a tradeline would never

---

[165] *Carvalho v. Equifax*, 629 F.3d 876, 890 (9th Cir. 2010) (quoting *Gorman*, 584 F.3d at 1163).

[166] *Drew v. Equifax*, 690 F.3d 1100, 1108 (9th Cir. 2012) (quoting *Carvalho*, 629 F.3d at 891).

[167] *Riekki v. Bank of America*, 2:15-cv-02312-GMN-VCF, Doc. 57 at 4 (D. Nev. June 10, 2016) (denying furnisher's motion to dismiss); *Polvorosa*, 2017 WL 29331, at *4 (denying furnisher's motion to dismiss and holding that reporting derogatory information during and bankruptcy and contrary to debtor's payment performance during the pendency of the bankruptcy sufficient to state a claim for inaccurate reporting).  Silver State's motion focuses exclusively on whether the information in question is "inaccurate," and never considers whether the information is also materially misleading.

[168] *See, e.g., Gorman*, 584 F.3d at 1163 (9th Cir. 2009) (citing *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148-50 (4th Cir. 2008) ("Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading.")).

[169] *Id.* at 1163 (quoting *Sepulvado v. CSC Credit Servs*, 158 F.3d 890, 895 (5th Cir.1998)).

[170] *Toliver v. Experian*, 973 F. Supp. 2d 707, 715 (S.D. Tex. 2013) (citations and quotations omitted).

appear on a consumer's tradeline, Silver State submits the Declaration of Amanda Hoover, an Experian employee.[171]  Ms. Hoover declares that "A compilation of Tradelines is included in a credit report that is viewed by credit furnishers, upon request, when making credit decision or for other permissible uses.  Experian calls this credit report a "Credit Profile Report."[172]  According to Ms. Hoover, "A Credit Profile Report" from Experian "would not show the 'Account history' section that appears at the bottom of the SSSCU account in the Dispute Results Report."[173]  Apparently relying on Experian's sworn declaration, Silver State concludes that a third party credit decision-maker would *never* see the "account history" information.

First, it is entirely unclear whether a "Credit Profile Report" is the *only* type of Experian product on which third party credit decision-makers would see.  As Silver State knows from another case filed in this District, *Travers*, Experian has produced the declaration of Anna Simmons, who defined "a report of credit information furnished by a CRA to a credit grantor, insurer, or employer for the purpose of evaluating a consumer's eligibility for credit to be used primarily for personal, family or household purposes, or for employment purposes."[174]  To define this purpose – very close to what Ms. Hoover defined it as – Ms. Simmons *did not* use the phrase "Credit Profile Report," but instead the phrases "consumer report" or "credit report."[175]  Ms. Hoover's declaration also defines Experian's reinvestigations as a "Dispute Results Report," when Experian's witnesses have repeatedly testified that the document is called a "Consumer Disclosure Final," or "CDF."[176]  In light of these contradictory statements, it's unclear what a "Credit Profile Report" is at all.

But the problems with Ms. Hoover's declaration run beyond mere distinctions in semantics – even for a company in the data management business, for whom precise codes and terminology are of paramount importance.  Silver State also has direct evidence that a "Credit Profile Report" is not the only type of report Experian sends to third parties; in fact, Experian's declarants have also testified that the "account history" section also appears on an Experian product known as "Trend

---

[171] *See* Hoover Declaration.
[172] *See* SUMF at ¶ 7; Hoover Declaration, at ¶ 10.
[173] *See* SUMF at ¶ 7; Hoover Declaration, at ¶ 30.
[174] *See* SUMF at ¶ 7; Simmons Declaration, at ¶ 7.
[175] Indeed, Silver State *itself* testified in this case that a document containing the same characteristics as a "Bullseye" would be a credit report.  *See* SUMF, at ¶ 18.
[176] *See* SUMF, at ¶ 7.

View."[177]   Thus, Ms. Hoover's statement that the information in the "account history" section Richard's reinvestigation would not be seen "by a credit furnisher who reviewed Plaintiff's Credit Profile Report after August 3, 2015" cannot be read to suggest that a third party *would never see* this information on an Experian product.

Thus, Silver State's contention that "the disputed information . . . is not seen by potential creditors in a Credit Profile Report"[178] misses the mark, because Silver State hasn't established what a "Credit Profile Report" actually is, what is on it, or who would actually see it.  What's clear is that *Experian*'s own testimony about its own credit products does not support Silver State's contentions. From this shaky foundation, Silver State re-urges its flawed argument that "Plaintiff's claims fail as a matter of law because there is no *consumer report* under 15 U.S.C. 1681a(d)(1) to give rise to liability.[179]  Richard's already conclusively disproved that point, and doesn't re-urge it here.

**E.  Silver State was required to correct the account balances, which arise as a direct consequence from Silver State's investigation.**

Silver State's final argument is that it was not "required" to correct any information on the account balances, because this information did not appear on the consumer report.[180]  However, the information arose as a direct consequence of Silver State's erroneous investigation, in which it placed an "L" notation on its ACDV response to Richard's dispute, which caused the balance on the account to appear.  Even though Silver State's actions arising *as a direct consequence* of the dispute caused the erroneous information to occur, Silver State now claims that to be liable, Richard would have to submit yet another dispute to Silver State and go through the whole process again.   What Silver State suggests is that so long as it reviewed the items in dispute, it had license to damage Richard's tradeline in any other manner it wished.

The Ninth Circuit disagrees with this overly restrictive interpretation of a dispute.  "By its ordinary meaning, an "investigation"[181] requires an inquiry likely to turn up information about the

---

[177] *See* SUMF at ¶ 7; Methvin Declaration, at ¶¶ 37-40, 43.   Silver State was aware of the Methvin Declaration; it was included in *Travers v. Experian*, 17-cv-1591-JCM-CWH, ECF Dkt. 1-1 (D. Nev. June 7, 2017).  As noted above, Silver State is a party to the *Travers* case, as it has threatened to bring a Rule 11 letter against plaintiff's counsel in that case.

[178] Motion, at 12.

[179] *Id.*

[180] *Id.*

[181] The FCRA recognizes a distinction between the terms "investigation" and "reinvestigation" to the extent those terms reference the duties of a furnisher and CRA, respectively.  *Compare* 15 U.S.C. § 1681s-2(b) (referencing the furnisher's duty to *investigate* upon notice of dispute), *with* 15 U.S.C. § 1681i(a) (referencing a CRA's duty to

underlying facts and positions of the parties, not a cursory or sloppy review of the dispute."[182] "[T]he plain meaning of the term 'investigation' is a 'detailed inquiry or systematic examination,' which necessarily 'requires some degree of careful inquiry.'"[183] And, "because the purpose of the provision is 'to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, a 'superficial, unreasonable inquir[y]' would hardly satisfy Congress' objective.'" Once Richard notified Silver State of his dispute through Experian, Silver State was not free to "cabin[] the scope of the investigation once undertaken."[184]

Moreover, if the CRA's obligation to conduct a "reasonable" inquiry did not extend beyond the immediate restrictions on what appeared on an ACDV response, then there would be little reason to require a consumer reporting agency to forward on all "additional relevant information" to Silver State, or for both parties to consider it; it would likely be sufficient for Experian to have provided Silver State with its ACDV response. However, both sections 1681i and 1681s-2(b) explicitly impose duties on the CRA and furnisher to consider this information,[185] and Experian forwarded on Richard's credit report to Silver State along with its ACDV (although Silver State apparently lost it). Indeed, not even Silver State agrees with this overly narrow restriction; its 30(b)(6) witness testified that when responding to a direct dispute from a consumer, Silver State would "we look at the documents according to the dispute reason and according to the specific fields that the credit dispute is asking us to look at."[186]  Depending on the circumstances, Silver State would also consult the CRRG or the e-Oscar help desk, as well as its policies and procedures.[187]  If a CRA attached additional information – such as, in this case, a copy of Richard's dispute letter and credit report – Silver State would also look at it.[188]  Indeed, for this dispute, Silver State not only compared this dispute to what was on Silver State's computers, but also "went onto PACER and pulled the docket

---

reinvestigate upon notice of a dispute).  However, while the respective terms evince a different set of respective procedural duties, the crux of either set of duties may still be understood by the ordinary meaning of the term "investigation."

[182] Gorman, 584 F.3d at 1155.
[183] Id. (quoting Johnson, 357 F.3d at 430).
[184] Id.
[185] 15 U.S.C. § 1681i(a)(2)(A) (CRA must furnish all relevant information to "regarding the dispute that the agency has received from the consumer . . . ."); 15 U.S.C. 1681s-2(b)(1)(B) (data furnisher must consider "all relevant information"), 15 U.S.C. 1681i(a)(4) (CRA must also consider "all relevant information").
[186] See SUMF at ¶¶ 9-13; Silver State Depo, 32:20-33:6.
[187] See SUMF at ¶¶ 9-13; Silver State Depo, 33:7-34:18.
[188] See SUMF at ¶¶ 9-13; Silver State Depo, at 47:3-48:1.

to see what the latest status was on the bankruptcy."[189]

In the event Silver State received an ACDV that did not contain a copy of a credit report, Silver State would not follow up with the CRA to see if anything was missing because the information transmitted from the CRA to Silver State via e-Oscar is "the same information in a different format," and "the dispute would contain the information on the credit report."[190]  Silver State believed that the CRA would be sending on "all relevant information" about the dispute.[191]  Silver State claimed it would look at "everything just to make sure,"[192] but also claimed that it "was not necessary" to review any additional relevant information attached to the dispute (such as the credit report Richard had attached) because "all of that is supposed to be on the e-Oscar dispute."[193]

This testimony suggests is that Silver State *itself* does not agree with its new legal argument that a dispute itself can by properly cribbed by the precisely disputed data fields.  There's no question that the newly appearing "account history" section occurred as a consequence of Silver State's decision to report a "charge off" notation on the ACDV response.  Thus, what Silver State's argument boils down to is that it is free to conduct an unreasonable inquiry, so long as that unreasonable inquiry results in different *words* on the credit report.  By Silver State's logic, for example, if Silver State inaccurately reported a "past due" balance of $10,000 when the actual past due balance was $1,000, and Silver State's investigation resulted in a new "past due" balance of $20,000, the consumer would have to dispute this *new* $20,000 balance information with Silver State prior to obtaining a private right of action because the consumer had disputed a "past due" balance of a different amount.  Worse still, in the case of accounts where the balance information changed month-to-month, Silver State could simply rereport the inaccurate information, wait for the balance to change as a result of monthly account updating, and then escape liability.  The FCRA's requirement of a "reasonable" investigation is designed to prevent this absurd consequence.

Indeed, Silver State's own actions underscore the futility of submitting repeated disputes, because Richard *did* notify Silver State of the improprieties in the account a second time – when he sued Silver State.  After being sued, Silver State obtained a copy of the "Bullseye," and after seeing

---

[189] *See* SUMF at ¶¶ 9-13; Silver State Depo, at 123:18-124:9.
[190] *See* SUMF at ¶¶ 9-13; Silver State Depo, at 102:104:9.
[191] *See* SUMF at ¶¶ 9-13; Silver State Depo, at 105:20-23.
[192] *See* SUMF at ¶¶ 9-13; Silver State Depo, at 119:25-120:3.
[193] *See* SUMF at ¶¶ 9-13; Silver State Depo, at 121:2-17.

that the account in question was not reporting, *confirmed* it erroneous reporting by claiming that it had "reported a charge-off of 'L,' suggesting that Silver State *wanted* to run the reporting from the charge-off date of May 30, 2014, and *not* either the bankruptcy petition date or even the date Richard had surrendered the interest.  If Richard had submitted another dispute as Silver State suggests, it would have acted the same way.

### F.  Silver State reported inaccuracies on Richard's tradeline.

A confirmed Chapter 13 plan controls for the purpose of correctly reporting credit performance, and failure to report payment obligations consistent with the confirmed plan is patently incorrect.  The Bankruptcy Code, 11 U.S.C. § 1327(a), provides that "[t]he provisions of a confirmed plan *bind the debtor and each creditor.* . . ."[194]  Recently, the United States Supreme Court held that "[c]onfirmation has preclusive effect, foreclosing relitigation of "any issue actually litigated by the parties and any issue necessarily determined by the confirmation order," and that "[s]ubject to certain exceptions, confirmation "vests all of the property of the [bankruptcy] estate in the debtor," rendering the property "free and clear of any claim or interest of any creditor provided for by the plan."[195]  Thus, the "order confirming a chapter 13 plan is binding, and res judicata precludes a creditor from bringing a collateral attack of that order."[196]

Here, Richard's Silver State account was subject to the controlling terms of his confirmed plan because Richard included the account on his January 31, 2009 bankruptcy petition, thus any derogatory information reported on these tradelines after the petition date could only be reported, if at all, if Richard failed to meet his obligations under the plan.  Neither the trustee, nor any party in interest opposed plan confirmation or sought dismissal or conversion based on non-payment under the confirmed plan.[197]  When the bankruptcy court entered its order confirming the plan, Silver State was bound by the plan's terms of repayment.  The bankruptcy court's order confirming the plan precludes any collateral attack of that order, at least until Silver State moved to and actually obtained an order lifting of the stay of the Court's order in March of 2010.  Even then, the order permitted Silver State to exercise its rights against the collateral *only*, not against Richard *personally*.[198]

---

[194] 11 U.S.C. § 1327(a) (emphasis added).
[195] *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015).
[196] *In re Okosisi*, 451 B.R. 90, 100 (Bankr. D. Nev. 2011) (citing *In re Brawders*, 503 F.3d 856, 867 (9th Cir. 2007)).
[197] *See* SUMF, at ¶¶ 2-5.
[198] *In re Okosisi*, 451 B.R. at 100.

Silver State's reporting that these debts had been "included in Chapter 13 Bankruptcy" on March 30, 2014 – the date of Richard's *discharge*, but not his *petition* – was patently incorrect.[199] Finally, Silver State's reporting of post-petition late payments from June 2009 through October 2009, and post-plan-confirmation payments between November 2009 and February 2010, was also patently incorrect,[200] as Silver State had knowledge of both Richard's Petition and October 2009 Confirmed Plan, as well as the fact that Richard agreed to "surrender" his interest in the collateral.[201]   Silver State only obtained an order lifting the stay months later, in March of 2010.

Unsurprisingly, Silver State spends less than two pages discussing whether it reported inaccurate information, and even in this brief discussion contends that it "is only responsible for what it furnishes, not what Experian reports."[202]  What Silver State *did* report was inaccurate: its ACDV response reported the account as "charged off" with a "balance date" of May 30, 2014.  Silver State contends that its reporting of the Account History can be excused because "the FCRA only requires that accounts be reported accurately, not reported that the delinquency did not exist."[203]

Silver State relies heavily in *Abeyta v. Bank of America, N.A.* for the proposition that "the Bankruptcy Code prevents certain collection activities, but does not alter the fact of delinquency."[204]  *Abeyta* is distinguishable because that case pertained exclusively to post-petition, *pre*-discharge obligations; this Court's decision in *Polvorosa*, which found that a claim alleging *post*-discharge reporting on an account survived a motion to dismiss, is on all fours with Richard's specific facts.  In Richard's case, as a consequence of Silver State's reporting the account as "charged off," it caused the "account history" section of his tradeline to report *post-discharge* obligations of over $11,834 *every month* from June 2015 through mid-2016 – *even while it reported a $0 balance as of Richard's bankruptcy discharge date*.  Silver State appears to read *Abeyta* to suggest that it can *continue* to report derogatory information *on a continuing basis* for seven years after his discharge date – i.e., that it can report an "account balance" of over $11,000 every month until 2021.  Like Silver State's oppressively restrictive definition of "notice," it cannot use the "fact of bankruptcy" as a get-out-of-

---

[199] *Id.*
[200] *Id.*
[201] *Id.* at ¶¶ 2-3.
[202] Motion, at 13.
[203] *Id.* at 14.
[204] *Id.* at 14 (citing No. 15-cv-2320-RCJ-NJK, 2016 WL 1298109, *appeal filed*, 4/19/2016).

jail-free card permitting it to report whatever it wants on Richard's credit report. The plain fact is that even if Silver State is right that the fact of bankruptcy does not make Richard's debts "magically disappear," nor can Silver State cause these debts to "magically appear" after the discharge date. That's what Silver State did here.  Its reporting of this information was patently inaccurate.

### G.  Richard suffered damages.

A denial of credit is not a prerequisite to recovery under the FCRA.[205]  "The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation."[206]  Under the FCRA, a plaintiff's out-of-pocket costs necessary for disputing a consumer report constitute cognizable economic damages.[207]  Silver State nonetheless argues that under *Spokeo v. Robins* and its progeny, Article III standing has not been met in this case,[208] claiming that (1) Richard has not demonstrated a "hard" credit denial, and (2) has never spoken to a medical professional or produced an expert witness.[209]  As noted above, Silver State never challenges either out-of-pocket damages Richard set out in his own motion for summary judgment, or his allegation that Silver State's conduct was willful.[210]  Richard re-urges these aspects of his own motion here, and notes that by consequence, his claims will survive summary judgment.  Richard addresses only the "hard" credit denials and emotional distress damages Silver State actually raises in its motion.

At his deposition, Richard testified that he has been dissuaded or unable to apply for credit, and couldn't put his name on a home he and his wife had purchased, due to the reporting on his bankruptcy – causing Richard to be upset, as he could not contribute to a major family purchase and could not tell his son that he owned a home.[211]  The fact that Richard can't contribute also led his

---

[205] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995).

[206] *Id*. (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.1983) (finding mental anguish recoverable in FCRA claims); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 514 (5th Cir. 1982); *Millstone v. O'Hanlon Reports*, 528 F.2d 829, 834–35 (8th Cir. 1976); *Bryant v. TRW*, 487 F. Supp. 1234, 1240 (E.D. Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982); *Jones v. Credit Bureau of Huntington*, 184 W.Va. 112, 117, (1990)); *see Drew*, 690 F.3d at 1109.

[207] *Saenz*, 621 F. Supp. 2d at 1085.

[208] Motion, at 15-16.  Silver State cites *In re Zappos.com, Inc.*, No. 12-cv-325-RCJ-VPC, 2016 WL 4521681, at *3 (D. Nev. Aug. 29, 2016) for the proposition that the FCRA requires "certainly impending and not just alleged to occur in the future." Motion, at 15.  Nothing in the *In re Zappos* order Silver State cites ever mentions a provision of the FCRA.

[209] Motion, at 15-16.

[210] Indeed, the requirement that a FCRA plaintiff seeking to prove willfulness need not establish damages and causation has been recently supported by other courts in this District.  *See, e.g.*, *In re Ocwen Loan Servicing LLC Litig.*, --- F. Supp. 3d ----, No. 16-cv-200-MMD-WGC, 2017 WL 1289826, at *5 (D. Nev. Mar. 3, 2017) (considering violation of 15 U.S.C. § 1681b); *Smith v. One Nevada Credit Union*, No. 16-cv-2156-GMN-NJK, 2017 WL 2803169 (D. Nev. June 27, 2017) (interpreting *In re Ocwen*).

[211] SUMF, at ¶ 23.

wife to pay a higher interest rate, meaning their house is in his wife's name only.[212]  Silver State's

suggested "re-aging" of his debt also caused Richard anxiety from the heightened risk that his

upcoming federal background check and necessary security clearance would be compromised if the

seven year "re-aging" of his bankruptcy ran from any date other than his voluntary bankruptcy

petition, and thus became a topic of conversation.  Finally, Richard suffered exacerbation of prior

medical conditions, and stress.[213]  In sum, Richard has demonstrated his entitlement to a host of

actual damages in the event of a mere negligent recovery against Silver State.

## CONCLUSION

Based on the foregoing, Silver State's Motion for Summary Judgment should be denied.

Dated: July 31, 2017

Respectfully submitted,

/s/ Miles N. Clark
Matthew I. Knepper, Esq.
Miles N. Clark, Esq.
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Ste. 170-109
Las Vegas, NV 89129

David H. Krieger, Esq.
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123

Allison R. Schmidt, Esq.
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117
Attorneys for Plaintiff

[212] *Id.*
[213] *Id.* at ¶ 24.

- 30 -