David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, Nevada 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Allison R. Schmidt, Esq.
Nevada Bar No. 10743
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117
Phone: (702) 387-7222
Fax: (702) 387-7222
Email: Allison@nevadaslawyers.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

RICHARD B. HOGUE,

        Plaintiff,

        vs.

ALLIED COLLECTION SERVICE, INC;
SELENE FINANCE, LLC; MOUNTAIN
AMERICA CREDIT UNION; SILVER
STATE SCHOOLS CREDIT UNION; IBEW
PLUS CREDIT UNION; EQUIFAX
INFORMATION SERVICES, LLC;
EXPERIAN INFORMATION SOLUTIONS,
INC,

        Defendants.

CASE NO. **2:16-cv-01620-JCM-VCF**

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Richard Hogue submits this reply in support of his motion for partial summary judgment on the issue of Defendant Silver State Schools Credit Union ("Silver State"). Richard's reply is supported by the following memorandum of points and authorities, as well as Richard's motion for partial summary judgment and his response to Silver State's motion for summary judgment, both of which he incorporates by reference.

## INTRODUCTION

Setting every other fact in this case aside, the undisputed facts establish that as a result of Silver State's investigation, it reported both a $0 balance "as of May 2014" *and* post-discharge reporting of a balance of $11,834 *every month* from June 2014 through May 2015. These items of information cannot possibly both be right, and make out a patent inaccuracy for purposes of liability under 15 U.S.C. § 1681s-2(b). Richard's damages also inevitably reach the jury, because Silver State failed to move for summary judgment on (1) Richard's out-of-pocket damages, which Richard testified he suffered, and (2) any portion of Richard's willfulness claim – which, if proven at trial, entitles Richard to statutory and punitive damages without any further proof. Thus, even if the Court agrees with Silver State on every single argument it raised in its own motion for summary judgment, Richard's 1681s-2(b) claims are destined for trial.

To explain away Plaintiff's legal claims, which he brought properly, explored in discovery, and for which Silver State never moved for summary judgment, Silver State resorts to a series of contradictory arguments. Regarding the "account history" section of the tradeline, which was undisputedly modified *as a result* of Silver State's incorrect reporting, Silver State contends that Richard never *explicitly* disputed this information, even though Richard could not have disputed what he had no knowledge of; at the same time, Silver State contends that Richard's Section 1681s-2(b)(1)(D) claim was not "brought" properly, even though he pled it on the face of his complaint, explored it in both his and Silver State's depositions, and produced admissible evidence corroborating it. Apparently, Silver State believes that an ordinary consumer like Richard should ask not only that his information be corrected, but also predict the future while anticipating every potential derogatory consequence of every potential erroneous investigation arising naturally within the scope Silver State's investigation. At the same time, Silver State insists that Richard

1 can't pursue claims he explicitly presented on the face of his complaint and explored in discovery.

2   Silver State also contends that it had no "duty" to respond to information that would not be

3 shown on a "consumer report," apparently because Silver State "deals" in the "world" of consumer

4 reports.  As outlined exhaustively in Richard's motion, Silver State's position is fundamentally

5 flawed, and stems from a misreading of the controlling statutes whose operation this court has

6 explained in *Polvorosa* and *Pauli*.  More problematically, Silver State neglects to tell the Court is

7 that its 30(b)(6) witness has testified in another case, *Travers*, that she did not know what

8 "consumer report" meant, and Silver State defended *that* action by arguing that "there is no

9 evidence or authority that [it is an] industry-side term[] or that SSSCU's knowledge of [that] term

10 would have resulted in [] different investigative results . . . ."[1]

11   Silver State's response shows the problem of trying to take the strongest possible legal

12 positions, without considering how those arguments work in the context of either the statutory

13 scheme or the facts on hand.  In some cases, Silver State's statutory analysis is fundamentally

14 defective; in others, its arguments suffer under the weight of patent contradiction.  If nothing else,

15 Silver State's arguments seemingly explain why it insists it did nothing wrong in responding to

16 Richard's dispute – and why, at an irreducible minimum, the scope of its reckless disregard for

17 Congress's clear mandate should be preserved for the trier of fact's scrutiny.

18   Richard incorporates the positions outlined in his motion and response to Silver State's

19 motion by reference, and turns to Silver State's arguments themselves.[2]

## DISCUSSION

**A. At the outset, it bears re-emphasizing that the undisputed material facts require judgment as a matter of law against Silver State as to its liability.**

  "To state a claim against a furnisher under Section 1681s-2(b), a plaintiff must allege that:

(1) [she] found an inaccuracy in [her] credit report; (2) he notified a credit reporting agency; (3) the

credit reporting agency notified the furnisher of the information about the dispute; and (4) the

---

[1] *Travers v. State Collection Services*, No. 16-cv-1848-RFB-PAL ("*Travers* Individual Case"), ECF Dkt. 103, at 13.  Indeed, Silver State has threatened to bring a Rule 11 letter in another case, *Travers v. Experian*, No. 17-cv-1591-JCM-CWH ("*Travers* Class Case"), in which it relies on the same fundamental misreading of 15 U.S.C. § 1681a(d), and further claims that that plaintiff's counsel violated the Nevada Rules of Professional Conduct by failing to inform the court of material evidence which was obtained in the *Travers* Individual Case.  Silver State's position is patently incorrect on both counts.

[2] Plaintiff's Motion for Partial Summary Judgment, ECF Dkt. 42 ("Motion"); Plaintiff's Response to Defendant's Motion for Summary Judgment, ECF Dkt. 46 ("Plaintiff's Response").

furnisher failed to investigate the inaccuracies or otherwise failed to comply with the requirements of 15 U.S.C. § 1681s-2(b)(1)(A)-(E)."[3]

Here, the undisputed material facts readily establish that Richard is entitled to judgment as a matter of law. Specifically, (1) Plaintiff's April 28, 2015 consumer report contained inaccuracies on his Silver State account,[4] (2) on July 17, 2015, Richard sent his Dispute to Experian, pointing out inaccuracies in Silver State's reporting;[5] (3) Experian forwarded on the dispute to Silver State,[6] and (4) Silver State failed to reasonably investigate the inaccuracies and comply with the requirements of the FCRA 15 U.S.C. § 1681s-2(b)(1)(A)-(E), by rereporting inaccurate information, adding more inaccurate information, and failing to send the results of his investigation to other CRAs.[7] Richard incurred statutory damages, because Silver State's reporting was reckless and willful; in that scenario, he need not prove actual damages.[8] Richard's out-of-pocket expenses were necessary in order to correct by Silver State's patently incorrect and materially misleading reporting.[9] A negligent or willful FCRA violation entitles plaintiff to attorney's fees and costs.[10]

**B. Plaintiff alleged the May 30, 2014 Discharge Date and his 1681s-2(b)(1)(D) allegations in the Complaint, and actively pursued them in discovery.**

**1. Silver State's arguments contradict the plain language of the complaint, and contravene both this District's local rules and principles of judicial economy.**

Silver State claims that "SSSCU's improper furnishing of the discharge date May 30, 2014, as the date when the SSSCU was derogatory may have resulted in the SSSCU Account being re-aged so that it will not drop off of his credit report seven years after he filed for bankruptcy, as required under the law. (ECF No. 42 at 16:5-8.)"[11] Silver State also claims that "SSSCU failed to forward the results of its dispute to Trans Union, in violation of 15 U.S.C. § 1681s-2(b)(1)(D).

---

[3] *Riekki v. Bank of America*, No. 2:15-cv-02312-GMN-VCF, 2016 WL 8737439, at *2 (D. Nev. June 10, 2016); *see also Gorman v. Wolpoff & Abramson*, 584 F.3d 1147, 1162 (9th Cir. 2009).
[4] Motion, Statement of Undisputed Material Facts, *supra*, ("SUMF"), at ¶ 6.
[5] *Id.* at ¶ 7.
[6] *Id.* at ¶ 8.
[7] *Id.* at ¶¶ 14,-17, 19-21.
[8] *Id.* at ¶¶ 10-12, 18-22.
[9] *Id.* at ¶¶ 22-25.
[10] ECF Dkt. 1; 15 U.S.C. §§ 1681n, 1681o.
[11] Silver State's Response to Plaintiff's Motion for Partial Summary Judgment, ECF Dkt. 50, at 4 ("Response").

(ECF No. 43 at 14:6-15.) None of these allegations were set forth in the Complaint."[12]

First, the complaint explicitly references both Richard's dispute, and Section 1681s-2(b)(1)(D).[13]  The time for Silver State to challenge the validity of the allegations in Plaintiff's complaint was in a motion to dismiss – which Silver State has filed, and which federal courts have denied.[14]  Plaintiff explored both the "account history" section and his Section 1681s-2(b)(1)(D) allegations in discovery.  Indeed, Silver State fails to acknowledge that early in this case, its counsel and Richard's counsel conducted an hour long meet-and-confer in which two attorneys at Silver State's firm attempted to convince Richard that his claims were meritless; the parties discussed the re-aging issue at length.  Silver State's failure to appreciate its exposure to Richard's causes of action until it was too late is, candidly, not Richard's problem.

More troubling are Silver State's position that the *arguments* Plaintiff raised to support his summary judgment motion were not sufficiently supported by the allegations in the Complaint, thus transforming them into "new claims."[15]  Silver State's position appears to be that Richard is foreclosed from bringing his claims now because he failed to amend his complaint to explicitly reference each new corroborating fact as it was uncovered in discovery.  This is not the function of a complaint, and if the Court adopted Silver State's proposed course of action, the case dockets in the District of Nevada would soon be filled with numerous and largely duplicative motions for leave to amend.  Moreover, the District of Nevada local rules presuppose that discovery will uncover new facts supporting the underlying allegations *after* the ordinary period for amending a complaint passes: the District's standard discovery plan places any leave-to-amend deadline 90 days *before* the close of discovery.[16]  What Silver State is really advocating for is a 90-day discovery period.

The fact is the Court should take neither of these actions, because Silver State has simply misunderstood the function of a complaint in federal court, and advanced a position at odds with the operation of this District's local rules, underlying principles of judicial economy, and the

---

[12] Response, at 4.
[13] Complaint, at ¶¶ 110, 123.
[14] *See Travers* Individual Case, ECF Dkt. 72 (minutes).
[15] *See* Response, at 17-19.
[16] *See* D. Nev. L.R. 26-1.  Silver State also overlooks that Richard's counsel tried to seek leave to amend in the *Travers* Individual Case, to do in part precisely what Silver State wanted here – and Silver State opposed plaintiff's motion as untimely.  *See Travers* Individual Case, ECF Dkt. 47, 51.

realities attendant with the progression of discovery in this case.

**2. Plaintiff's complaint adequately alleges a 1681s-2(b)(1)(D) violation.**

Silver State complains that Richard never raised allegations under 15 U.S.C. § 1681s-2(b)(1)(D).[17]  This provision of the FCRA provides that "After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—. . . (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis[.]"[18]  Paragraph 123 of the Complaint in this case alleges,

> By inaccurately reporting account information relating to the discharged debt after notice and confirmation of its errors, SCHOOLS and Experian failed to take the appropriate measures as required under 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).[19]

At Silver State's 30(b)(6) deposition, Richard's counsel asked numerous questions about Silver State's interactions with and knowledge of Trans Union, including (1) whether Silver State reported data to Trans Union,[20] (2) whether Silver State discussed the Metro 2 with Trans Union,[21] (3) whether Trans Union contributed to the development of the CRRG.[22]  During Silver State's deposition, Richard introduced the same January 16, 2017 Trans Union credit report which he used in his motion for summary judgment, and directed Silver State's witness to the Silver State accounts still reported there.[23]

Richard's counsel then had Silver State's witness identify one of the reported Silver State accounts, identify it as the account Richard disputed with Experian, then asked Silver State's witness why the information on this Trans Union report was different from that reported by Experian on reinvestigation.[24]  Silver State's witness *acknowledged* the difference and stated she had no explanation for why the information was different because "the credit bureaus are all

---

[17] Response, at 4.
[18] 15 U.S.C. § 1681-2(b)(1)(D).
[19] Complaint, at 123.
[20] *See* Motion, Exhibit 21, Silver State Depo, 37:4-6.
[21] *See id.* at 130:18-23.
[22] *See id.* at 136:19-137:13.
[23] *See id.* at 264:8-265:3.
[24] *See id.* at 265:4-266:15.

supposed to contain that same information."[25]   While Silver State's witness contended that Silver State "send[s] one file to all the credit bureaus," Richard's counsel then directed Silver State's witness to the "date updated" on the Trans Union account, which was July 2015 – *before* the date Silver State had testified it sent the ACDV response back to Experian in this case.[26]   Silver State already testified that "if there's changes, we make the changes on the ACDV.  That gets sent through e-Oscar back to the credit bureaus.  That's the only response on those."[27]   Silver State also testified that the date of the ACDV response date was the "Resp. Date" field on the ACDV response.[28]   On the ACDV response, Silver State responded on August 3, 2015.[29]   August 3, 2015 is after July 2015.  Thus, Silver State *could not have* sent its ACDV response to Trans Union. Consequently, it's little surprise why Trans Union's January 2017 consumer report reported different information for Silver State than did Experian.  Silver State did not cross-examine on any of these topics.[30]

Even if Silver State was caught off-guard by these questions, it had another opportunity to explore them at Richard's own deposition.  On cross-examination, Richard's counsel introduced a copy of the Trans Union credit report, and Richard identified the fact that two Silver State accounts were reporting there.[31]   Silver State conducted no re-direct examination on the topic.

Against this evidence, Silver State comes forward with a website from e-Oscar in which it "automatically forwards ACDV responses to the credit reporting agencies with which SSSCU has an account."[32]   Silver State does not seek judicial notice of this website, and there is nothing in its contents which makes it subject to the same.  But even if Silver State *could* authenticate the website and even if Silver State *could* put it forward as conclusive proof, all of the admissible evidence points in the *opposite* direction: i.e., the Silver State account on the January 2017 Trans Union credit report indicates the account was updated *before* the ACDV response was received, and Silver State *could not* produce a copy of its contracts with *either* Experian or e-Oscar

---

[25] *Id.* at 266:16-267:3.
[26] *Id.* at 267:20-24.
[27] *Id.* at 73:3-19; 169:12-170:2.
[28] *Id.* at Silver State Depo, at 171:23-172:3.
[29] *See* Motion, Exhibit 13, ACDV Response.
[30] *See* Motion, Exhibit 21, Silver State Depo, at 270:20-25.
[31] *See* Motion, Exhibit 22, Hogue Depo, at 302:1-303:15.
[32] Response, at 19.

- 7 -

specifying that the ACDVs would be deemed transmitted on any other date.

In sum, it's beyond question that Richard properly alleged his Section 1681s-2(b)(1)(D) allegations, explored them in discovery, and developed admissible evidence to support them. Silver State simply chose not to move on this theory, and in response contends nothing more than that these allegations are not part of the Complaint – *except that they are*.  Silver State's failure to read both the Complaint and the tea-leaves in discovery is no excuse for why it should be permitted to simply argue these claims out of existence at the eleventh hour.

### 3.   Plaintiff adequately put Silver State on notice of the May 30, 2014 discharge date.

Silver State claims that "SSSCU's improper furnishing of the discharge date May 30, 2014, as the date when the SSSCU was derogatory may have resulted in the SSSCU Account being re-aged so that it will not drop off of his credit report seven years after he filed for bankruptcy, as required under the law. (ECF No. 42 at 16:5-8.)"[33]  But paragraph 110 of the Complaint contains an excerpt from Plaintiff's Dispute Letter, which indicates that Plaintiff's bankruptcy was "discharged 5/30/2014," and Plaintiff's Dispute Letter, as explicitly incorporated in the Complaint, stated, "There should be no derogatory reporting after the *filing date*."[34]  Issues related to Silver State's reporting on the account *after* Richard filed his bankruptcy were plainly within the scope of both Plaintiff's dispute and the allegations in the Complaint, and both facts were explored in discovery.  At both SSSCU's deposition and Plaintiff's deposition, the allegation was raised and Plaintiff identified the issue as being one in dispute.

### C.   Silver State's legal arguments lack merit.

#### a.   Silver State's claim that it had a "duty" to respond to the information in Richard's consumer report contradicts its arguments in its Motion that it had no such "duty."

Silver State baldly contends that it "complied with the requirements of 15 U.S.C. § 1681s-2(b) in responding to the Dispute."[35]  These would include consideration of any "additional relevant information" sent by Experian to Silver State, which in this case included a copy of Richard's Experian consumer disclosure, as Section 16891s-2(b) mandates.  To get around this

---

[33] *Id.* at 4.
[34] Complaint, at 110.
[35] Response, at 11.

problem, Silver State contends that "SSSCU was under no duty [to] investigate Plaintiff's consumer disclosures (e.g., Plaintiff's 'Your Personal Credit Report' and 'Dispute Results Report') as they are not consumer reports."[36]  Silver State adds to its response the contention that apparently because Silver State "deals" in the "world" of "consumer reports."[37]  In essence, Silver State contends it had no "duty" to respond to anything other than a "consumer report," because Silver State "does not deal in the world of consumer disclosures, but in the world of Bullseyes and consumer reports."[38]

Silver State's argument ignores the fact that a "consumer report" is a defined term under the FCRA's plain language, a reality this Court's recent guidance in *Polvorosa* and *Pauli* readily recognize.  Specifically, Section 1681i permits a consumer to dispute information in a consumer's "file" – with "file" a defined term under the FCRA.[39]  Upon notification of the dispute, a CRA must forward notice of the dispute and "additional relevant information" to a furnisher like Silver State.[40]  "After reviewing notice pursuant to section 1681i(a)(2) . . . of a dispute with regard to the completeness or accuracy of *any information* provided by a person to a [CRA]," the data furnisher is obligated to, *inter alia*, investigate the dispute and review all relevant information.[41]  Upon completion of its investigation, Silver State must notify the CRA of the results of its investigation.[42]  Thereafter, Experian is required to send the disputing consumer the results of its reinvestigation, which must take the form of a "consumer report" – with "consumer report" a defined term under the FCRA.[43]

Nothing in Section 1681s-2(b) restricts Silver State's investigation to information contained in a "consumer report."  Instead, Silver State is required to review "any information," it receives from a CRA, as well as to review all "relevant information" the CRA has provided.  But under Silver State's reasoning, it would have no "duty" to investigate *anything it had reported* on a consumer's account, so long as that information would undisputedly never appear on a consumer

---

[36] *Id.* 11 n.1.
[37] *Id.*
[38] *Id.*
[39] 15 U.S.C. §§ 1681i(a)(1); 1681a(g).
[40] *Id.* at § 1681i(a)(2).
[41] *Id.* at § 1681s-2(b).
[42] *Id.* at § 1681s-2(b).
[43] *Id.* at §§ 1681i(a)(6)(B)(ii); 1681a(d).

report.  Silver State could thus report *anything it wanted* to Experian about Lynn – no matter how hurtful, derogatory, or inaccurate – so long as this information did not appear on a "consumer report" as Silver State has erroneously and inaccurately defined it.  And Lynn would then have absolutely no means of contesting this information, or holding Silver State liable to its obligations under the FCRA. Since it is undisputed in this case that Experian sent Silver State (1) Richard's Dispute Letter, and (2) Richard's credit report.  Thus, Experian's "notice" of the dispute contained more than the ACDV itself, and Silver State had a duty to consider this additional relevant information.  To the degree it believes it had no "duty" to review the information, and applied this policy, Silver State's policies and procedures were patently unreasonable.[44]

The FCRA protects consumers from this myopic result in several ways.  First, it defines "file" and "consumer report" differently under Section 1681a.[45]  While both definitions are clearly broad enough to encompass Bullseyes, Experian "consumer disclosures,"[46] "file" is defined in broad terms.  Second, Section 1681i refers to "file" and "consumer report" in discrete and separate portions of the subsection – making a furnisher's investigation duties, and liability for failures, premised on a failure to investigate any information contained in the "file."[47]  And if this were not enough, it requires a CRA to send its reinvestigation back to the consumer in the form of a "consumer report."[48]

More problematic, Silver State adds the argument that, "when comparing the ACDVs with Plaintiff's consumer disclosures, it becomes evident that SSSCU does not deal in the world of consumer disclosures, but in the world of Bullseyes and consumer reports."[49]  Apparently, Silver

---

[44] Interestingly, the byproduct of Silver State's argument is that Plaintiff "later disputed" the "account history" section of the tradeline (presumably when he filed the complaint).  *See* Response, at 17.  For reasons that have nothing to do with the analytical conclusion Silver State puts forward to support them here, Plaintiff agrees with Silver State's conclusion that a complaint is also a consumer dispute, and has sought to bring class claims against Experian for its violations of 1681i in that respect.  *See Mainor v. Acctcorp, Inc.*, No. 16-cv-183-RFB-PAL, ECF Dkt. 34 (D. Nev. Jan. 8, 2016).  Suffice to say, if the Court agrees with Silver State that the "account history" sections were not disputed in Richard's original dispute but "later disputed" when Richard filed the Complaint, then it has validated the proposed allegations in *Mainor*.

[45] 15 U.S.C. §§ 1681a(d) ("consumer report"); 1681a(g) ("file").

[46] *See* Plaintiff's Response, SUMF, at ¶ 7 (citing deposition testimony, and noting that Experian considers "consumer disclosures").

[47] *Id.* at § 1681i(a)(1).

[48] *Id.* at § 1681i(a)(6)(B)(ii).  Assuming the Court bends over backwards to give credence to Silver State's wild and unsubstantiated restriction of its own "duties" to a "consumer reports," perhaps what Silver State appears to be arguing, albeit inartfully, is that it had no duty to look beyond the four corners of the ACDV Experian sent, because the ACDV *itself* was the "consumer report" triggering Silver State's response duties.

[49] Response, at 11 n.1.

State believes that the "worlds" of "consumer disclosures" and "consumer reports" are not subject to the plain statutory definitions of Sections 1681a(d), 1681a(g), and 1681g(a), but instead hinge on Silver State's self-styled explanation of whether the documents themselves are filled with industry jargon or not.

Finally, and most problematically, Silver State's legally flawed and self-chosen restriction on its "duties" is the fact that these "duties" may place the proverbial cart before the horse.  If Silver State believes that its "duty" to investigate arises only in connection with a "consumer report," then it means that its "duties" to conduct an investigation only arise *after* a CRA submits a "consumer report" to the consumer under Section 1681i(a)(6)(B)(ii).  Does this mean that Silver State's "duties" to investigate arise only after a dispute is completed?

To appreciate the scope of Silver State's "duties" to investigate a consumer dispute which triggers a private right of action under the FCRA, the Court should disregard Silver State's untethered opinion and look carefully at the precise terminology used to define "consumer report" and "file," and how those defined terms are actually and specifically applied in Sections 1681i and 1681s-2(b).

**b. Silver State ignores its failure to investigate all of the items in Plaintiff's Dispute, and that it should have "learned" more about his dispute than it actually did.**

Silver State's oppressively narrow and legally unfounded argument regarding the scope of its "duties" to reinvestigate continues when Silver State claims that its own *internal records* regarding Lynn's account are "irrelevant" for it to consider when performing an investigation – even though these records would have demonstrated that no ongoing payment was due.[50] Moreover, although Silver State insists that its claimed policy was to review "all" of the relevant information included in the Dispute, it had no idea whether it had done so or not – because it had misplaced the records in question.  But not even Silver State's 30(b)(6) witness agrees with the arguments its counsel has raised – she testified that when responding to a direct dispute from a consumer, Silver State would "we look at the documents according to the dispute reason and according to the specific fields that the credit dispute is asking us to look at."[51]

---

[50] Response, at 5.
[51] *See* Motion, SUMF at ¶¶ 9-13; Exhibit 21, Silver State Depo, 32:20-33:6.

Silver State's own list of the corrections it made to Lynn's account illustrate how fundamentally wrongheaded its position was.[52]  For example, it is undisputed that Plaintiff reported a $0 balance as of the date of bankruptcy discharge.  However, the CRRG would have required Silver State to report a $0 balance as of the bankruptcy *petition* date.  Moreover, the account was not reporting to Silver State as "charged off" as of the bankruptcy petition date.  Silver State claims that the post-discharge bankruptcy amounts were not an item of "relevant information" it needed to consider.   It is difficult to fathom why this information would not be relevant, as it was fundamentally inconsistent with the $0 balance Silver State also reported.

### c. Silver State failed to update the account appropriately or address all inaccurate information.

Silver State contends that it fixed the problems Richard asked him to.[53]  This is not true, as Richard put Silver State on notice that his bankruptcy petition was filed in August 2009; that he requested no derogatory information from the date of petition.  Under the CRRG, Silver State was required to report a CII status of "H," and a "status" at the time of *petition*.[54]  Richard's Silver State account was not reported as "charged off" at the time of the petition.  Richard's controlling plan indicated that the interest was to be surrendered; thus, it was part of his confirmed plan.  No action Silver State took after that time changed that fact.

Even assuming Silver State is somehow correct that when it withdrew Richard's asset from the bankruptcy its obligation to report the fact of bankruptcy was extinguished, Richard's account should have reported that the debt was "included" in Chapter 13 bankruptcy at the time of the *petition* date, not the *discharge* date.   By reporting the account as "included" in Chapter 13 bankruptcy on the date of discharge, Silver State suggested that the seven-year derogatory period related to the bankruptcy reporting would run from seven years from the "inclusion" date, and not from the date Richard voluntarily surrendered his interest.  Finally, Silver State's reporting of the "charge off" had the consequence of causing the "account history" section of Richard's reinvestigation to report *post-discharge amounts* of $11,834 *every month* from June 2014 through May 2015.  Both these stated amounts, and Richard's "recent balance" of "$0 as of May 2014,"

---

[52] Response, at 16-17.
[53] *Id.* at 14-15.
[54] Motion, Exhibit 19, CRRG, 6-25.

cannot possibly both be correct.  Silver State might have caught these errors if it had conducted anything other than a cursory review of Richard's dispute; but by its own admission, it did not believe it had a "duty" to respond to information in Richard's dispute letter or the Experian credit report Richard attached to his dispute, and apparently believes that an inquiry into its own internal records was "irrelevant."  Still, not even Silver State believes it made all of the changes Richard requested; it concedes that it made "*almost* all" of them, but not *all* of them.[55]

Silver State contends that it does not matter what documents Silver State had in its possession, but rather what it did with that information.[56]  The problem is that the documents Silver State has misplaced – its ACDV response, the additional information Experian forwarded to it, and even the Metro 2 guidelines which would have informed its understanding of how to report data – form the basis for Silver State's contentions that its investigation was reasonable.  These absences also speak volumes for whether Silver State appreciated the implications of the information it actually reported on its ACDV response – such as that by reporting the account as "charged off," Silver State would cause the post-discharge balances to appear.

It's no surprise that Silver State takes this position – as it also contends that it is under no obligation to consider whether its reporting will lead to inaccuracies.[57]  It is true that the "account history" section was not reporting on Richard's tradeline when he disputed the information; that information arose *as a direct consequence* of the reinvestigation.  Silver State's position is similar to a plumber hired to fix a leaky kitchen sink who fixes the leak by simply ripping out the plumbing itself, and then claiming no liability because he has done what he asked – i.e., the faucet is no longer leaking – and that if a customer wanted him to fix the problem his own handiwork had created, it would have to pay him to do so.

To the degree Silver State was completely unaware of the consequences of reporting a "charge off" or other information on its ACDV response which would result in the reporting of the fundamentally inconsistent post-discharge "balance history" at the same time Silver State reported a $0 balance, then Silver State's its ignorance either bespeaks its misunderstanding of how Experian would report credit, or else bespeaks its own misunderstanding of how the CRRG codes

---

[55] Response, at 19.
[56] *Id.* at 23.
[57] *Id.* at 20.

would have worked.  Under the *Gorman* standard which Silver State acknowledges controls here, a cursory or sloppy investigation will not do.  Silver State can't stop a faucet from leaking by simply ripping out the plumbing and walking away.

### d.  Silver State's policies are in fact in state of disrepair, and that fact is probative of the reasonableness of Silver State's investigation.

Silver State contends – ignoring the multitude of other arguments Richard made – that the "heart" of Richard's contention has to do with Silver State's failure to maintain records.[58]  This mischaracterizes the "heart" of the allegations, which instead hinge on the patent inaccuracies in Richard's reinvestigation, which arose as direct consequence of Silver State's own investigation. Silver State's record-keeping goes only to its culpability, and whether its conduct is reckless.

First, it is troubling that a financial institution which *depends* on enforcement of written agreements for its continued existence to support its members does not keep copies of its written contracts with (1) Experian, (2) e-Oscar, and has apparently destroyed the single most important interpretive document which would have aided its interpretation in this case.  Further evidence of Silver State's blatant disregard for its contractual responsibilities comes in the motion briefing itself, where Silver State disclosed into the public record pages from the CRRG manual.  However, the CRRG (which Richard filed under seal) contains the following provision:

> 5.  **CONFIDENTIALITY.** You acknowledge and agree that the certain parts of the CRRG® contain proprietary trade secrets and confidential information of CDIA (the "Confidential Information"). *You agree to secure and protect the confidentiality of this Confidential Information of CDIA in a manner consistent with the maintenance of CDIA's rights therein, using at least as great a degree of care as you use to maintain the confidentiality of your own confidential information of a similar nature*, but in no event using less than reasonable efforts.[59]

Silver State's violation of the CDIA's trade secrets may stem from its destruction of the manual itself.  However, it underscores the fact that Silver State's shoddy record-keeping may be part and parcel with its disregard of whatever course of action the contract may specify.  It clearly indicates that Silver State does not take its contractual obligations seriously – and the blatant

---

[58] *Id.* at 12.

[59] Motion, Exhibit 19, CRRG, at 5 (emphasis added).  Although provided with no guidance from Silver State, a reasonable reading of this portion of the CRRG does not appear to implicate any confidential material itself.

disregard of this financial institution for its contractual obligations is probative of its recklessness. Silver State may trust nothing greater than its "instincts" in deciding whether its reporting is or is not accurate. To the degree it did so and was wrong, its conduct was clearly reckless.

### e. Silver State's contention that the information in the "account history" section is not cognizable as a matter of law, and is untrue as a matter of fact.

Silver State contends that its errors are apropos of nothing, because they do not appear on a consumer report.[60] As pointed out in Richard's response to Silver State's motion, Silver State appears to have misread *Gorman*'s disjunctive standard for finding an inaccuracy: either the information can be patently incorrect, *or* materially misleading – and only the second type of inaccuracy is one which more directly implicates the import of the information on a future credit decision-maker.[61] Of the $0 balance Silver State reported on the date of Richard's reinvestigation, and its post-discharge account balances of $11,834, both cannot be accurate. Silver State reported patently incorrect information even after its investigation; the Court need not proceed any further.

Even if the Court reaches the astonishing conclusion that the account balances of $11,834 are not patently incorrect, but instead "materially misleading" – a conclusion which under *Gorman* would require the Court to find that the information was technically true – nothing in the *Gorman* decision *requires* the information to be presented in the form of a consumer report.

Even if the Court gives Silver State this benefit of the doubt, Silver State's evidence in support is simply inaccurate. As pointed out in Richard's response to Silver State's motion for summary judgment, the Declaration of Amanda Hoover is directly contradicted by the declaration of Mary Methvin, another Experian employee with respect to (1) whether a "Credit Profile Report" is the *only* type of Experian product on which third party credit decision-makers would see; and (2) whether the "account history" section of an Experian tradeline is never included on Experian's consumer reports.[62] Thus, *Experian*'s own testimony about its own credit products does not support Silver State's proposition about what information would appear on a consumer report.[63]

---

[60] Response, at 15-16.
[61] Plaintiff's Response, at 21-22.
[62] *Id.*
[63] *Id.*

### f.   Silver State's damages-based arguments are unavailing.

#### i.   Silver State's willfulness arguments lack merit.

Silver State contends that Richard hasn't made out a case for willfulness.[64]   Not so.   As argued in Richard's motion, Silver State (1) threw out the relevant copy of the CRRG, and (2) could not produce a fully executed contract with Experian.   Indeed, in another case in this district, the same 30(b)(6) witness testified that she also did not have a written contract with e-Oscar, and *that she did not know what a consumer report was*.[65]   Comparison of the testimony in that case indicated that Silver State and Experian had fundamental differences of opinion regarding what basic industry reporting terminology meant.

But most critically, when Silver State obtained a copy of its Bullseye consumer report, it expressed confusion to Experian in an email, as to why the account was no longer reporting.   Silver State knew precisely what it was doing when it reported the account as "charged off," and wanted to keep the negative reporting on Richard's tradeline as long as possible – regardless of what the CRRG would require.   Thus, Silver State's conduct was either reckless in not gaining a reasonable appreciation for the consequences of its reporting, or else it knew *exactly* what it was doing when it reported Richard's credit, and set out to injure him longer than the industry standards would otherwise mandate.   Either way, Silver State's conduct was willful.

#### ii.   Silver State's negligence arguments lack merit.

Silver State contends that Richard has no evidence of his damages; again, not so.[66]   "The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation."[67]   Under the FCRA, a plaintiff's out-of-pocket costs necessary for disputing a consumer report constitute cognizable economic damages.[68]   A denial of credit isn't a prerequisite

---

[64] Response, at 23-24.

[65] *See Travers* Individual Case, ECF Dkt. 93-26, 30(b)(6) deposition of Silver State Schools Credit Union, at 94:20-96:7.

[66] Response, at 25-27.

[67] *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.1983) (finding mental anguish recoverable in FCRA claims); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 514 (5th Cir. 1982); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834–35 (8th Cir. 1976); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1240 (E.D. Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982); *Jones v. Credit Bureau of Huntington, Inc.*, 184 W.Va. 112, 117, (1990)); *see Drew*, 690 F.3d at 1109.

[68] *Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1085 (D. Or. 2007).   Richard's also incurred attorney's fees as a result of prosecuting this action.   15 U.S.C. §§ 1681n, 1681o.   While again not a part of Richard's motion for partial summary judgment, and a categorical necessity if the Court finds that Silver State willfully or recklessly violated the FCRA, the Court may elect to find Richard's out-of-pocket damages "close out" Silver State's liability.

to FCRA recovery.[69]

Richard's suffered actual damages in the form of out-of-pocket expenses.[70]   At his deposition, Richard testified that he has been dissuaded or unable to apply for credit, and couldn't put his name on a home he and his wife had purchased, due to the reporting on his bankruptcy – causing Richard to be upset, as he could not contribute to a major family purchase and could not tell his son that he owned a home.[71]   The fact that Richard can't contribute has also led his wife to pay a higher interest rate, and meant that the house was in his wife's name only.[72]   Silver State's suggested "re-aging" of his debt also caused Richard anxiety in that there was a heightened risk that his upcoming federal background check and necessary security clearance would be compromised if the seven year "re-aging" of his bankruptcy ran from any date other than his voluntary bankruptcy petition, and thus became a topic of conversation.   Though Silver State attempts to contend that there is no evidence the debt was *actually* re-aged,[73] nothing on Richard's Experian reinvestigation told him that – and because the information was patently inaccurate, it's the focus on what Richard perceived which counts.   Richard has demonstrated entitlement to a host of actual damages.

**D. Virtually all of Silver State's "disputed" items of material fact are largely mere argument and should not be considered.**

Silver State "disputes" various portions of Richard's statement of undisputed material facts, which Richard addresses briefly, and notes that many of Silver State's "disputes" are comprised of nothing more than bare legal argument without citation to any contradictory admissible evidence.

For paragraphs 2 and 3, Silver State offered only bald assertions, devoid of any supporting admissible evidence, to show why the facts are in dispute.[74]   Silver State "conditionally disputes" paragraph 9, claiming that it "has, or had, a legal obligation" to maintain an ACDV.[75]   Plaintiff

---

[69] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995).

[70] Motion, SUMF, at ¶ 23.   Silver State leans heavily on an out-of-circuit case, *Wantz v. Experian Information Solutions*, 386 F.3d 829 (7th Cir. 2004), *abrogated by* 551 U.S. 47 (2007).   This now-abrogated out-of-circuit decision is not persuasive of anything, and at a minimum it should be noted that *Wantz* did not address out-of-pocket expenses – only emotional distress damages.   *See id.* at 833-34.

[71] Motion, SUMF, at ¶ 23.

[72] *Id.*

[73] Response, at 21-22.

[74] *Id.* at 4-5.

[75] *Id.* at 6.

- 17 -

never suggested this; however, Silver State testified that it had a *policy* of saving internal documents, which it did not follow.[76]   For paragraph 11, Silver State "disputes" without stating which portion of paragraph 11 is disputed.[77]

For paragraph 12, Silver State "disputes" the information contained therein without stating which portion of the paragraph is disputed.[78]  Tellingly, what Silver State does not dispute is that it destroyed its copy of the 2013 CRRG which controlled the disposition of this dispute.  Ironically, while Silver State disputes the ability of Richard to use Silver State's 30(b)(6) transcript from the *Lynn* individual case – as it applied to testimony relating to Silver State's own policies and procedures for investigation of consumer disputes, the same issue confronted by the parties here – Silver State uses the deposition testimony *later in the response* to support one of its own propositions.[79]  Thus, even if Rule 32 and Federal Rule of Evidence 801 did not *permit* Plaintiff to utilize a deposition transcript in this manner, Silver State cannot have it both ways.

Paragraph 14(a) is "disputed" because Silver State again contends baldly that its reporting of a "closed date" was "paradoxical," but Silver State provides no admissible evidence to support its contention.[80]  In Paragraph 16, Silver State disputes that it reported account balances of $11,834 every month from August 2013 through May 2015.[81]  Silver State provides no facts that anyone else would have reported a balance of $11,834 on a Silver State tradeline *other than Silver State*. Does Silver State contend that *Experian* simply derived this balance from thin air? That another data furnisher reported it?  Silver State also claims that "Experian has testified that this information *is only seen by the consumer and not disclosed to third-parties*."[82]  However, Plaintiff's response demonstrates that the declaration supporting this proposition has been shown to be conclusively untrue.[83]   Silver State also contends that citation to its own internal records is "not relevant to the

---

[76] Motion, SUMF, at ¶ 9.
[77] Response, at 6.
[78] *Id.* at 6-7.
[79] Response, at 13 ("As an evidentiary matter, the argument that SSSCU does not have an e-Oscar contract is incorrect.").  This is not even what the testimony in the *Travers* Individual Case case demonstrates; in that case, as in this one, Silver State could not point to an *executed* contract.  *See Travers* Individual Case, ECF Dkt. 93, at 26-27. Richard has no objection to Silver State's use of that transcript, as this furthers judicial economy.  He simply asks that the Court permit *both* parties the ability to use it.  Such use is undisputedly proper under FRCP 32 and FRE 804.
[80] Response, at 7.
[81] *Id.* at 8.
[82] *Id.* (emphasis added).
[83] *See* Plaintiff's Response, at 22-24 (noting contradictions between, *inter alia*, the Hoover Declaration Silver State cites, and the declarations Experian has provided in other cases).

current FCRA claims."[84]  It is difficult to imagine how Silver State's *own understanding* of the account that it *investigated* could not be viewed as relevant.  If the records were not relevant, it is an open question why they were produced.

In paragraph 17, Silver State asserts that the information is "disputed" because "there is no place to put such a comment on the ACDV and that the credit furnisher, not the data furnisher, places such comments."[85]  However, there is nothing in Silver State's testimony which suggests that the ACDV response was the *exclusive means* by which Silver State could send information to Experian.  Silver State also testified that it could send an AUD to the "credit furnishers," and that it communicated with the e-Oscar helpdesk and Experian representatives both by telephone and email.  Use of the ACDV was a predicament entirely of Silver State's own making.

In Paragraph 18, Silver State characterizes the testimony as a "gross mischaracterization"[86] while ignoring what the plain language of Silver State's email to Experian, which Silver State authenticated, actually said: i.e., that Silver State was confused that the account was not reporting, *as Silver State had not intended it to be reported that way*.  Thus, if Silver State had its way, the account *would have reported* longer than the manner in which the CRRG guidelines specified and in fact believed that it should have.

Paragraphs 19-21 are claimed to be "disputed and objectionable."[87]  Plaintiff has already established why he sufficiently alleged his Section 1681s-2(b)(1)(D) claim.  Paragraph 22 is "disputed," as "Plaintiff has no evidence of damages," even though Richard testified to them.[88]  Paragraph 23 is "disputed," but once again Silver State limits its argument to (1) a firm denial of credit, and (2) evidence of emotional distress without arguing that out-of-pocket expenses are cognizable.[89]  Plaintiff has presented both legal authority supporting these damages and admissible evidence that he suffered them.  Paragraph 24 is "disputed" once again without citation to any authority.[90]  Further, Silver State's claim that "there was no re-aging of the debt" fails to mention that this is how Richard's Experian reinvestigation *appeared* when Richard received it.

---

[84] Response, at 8.
[85] *Id.*
[86] *Id.* at 8-9.
[87] *Id.* at 9.
[88] *See id.*
[89] *See id.*
[90] *See id.*

In sum, Silver State's "disputes" regarding the admissible evidence are almost entirely unsubstantiated.   Richard asks the Court to weigh the evidence submitted by both sides to determine whether Silver State has in fact properly "disputed" any of Richard's evidence at all.

## **CONCLUSION**

For the above-mentioned reasons, the court should grant Richard's motion.

Dated: August 14, 2017

Respectfully submitted,

*/s/ Miles N. Clark*

Matthew I. Knepper, Esq.
Miles N. Clark, Esq.
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Ste. 170-109
Las Vegas, NV 89129

David H. Krieger, Esq.
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123

Allison R. Schmidt, Esq.
ALLISON R. SCHMIDT ESQ. LLC
8465 W. Sahara Ave.
Suite 111-504
Las Vegas, Nevada 89117

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2017, and pursuant to the Federal Rules of Civil Procedure, a true and correct copy of **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** was served via the U.S. District Court's electronic filing system and by email to all individuals entitled to receive notice of the same.

/s/ Miles N. Clark
An employee of Knepper & Clark LLC